**COLUMBIA BASIN LAND PROTECTION ASSOCIATION, an unincorporated association, et al., Plaintiffs,**

v.

**Thomas S. KLEPPE, Secretary of Interior, and Donald Paul Hodel, Administrator, Bonneville Power Administration, Defendants.**

No. C–76–6.

United States District Court,
E. D. Washington.

March 29, 1976.

Stephen P. Ryder and Richard W. Pierson, of Thom, Mussehl, Navoni, Hoff, Pierson & Ryder, Seattle, Wash., for plaintiffs.

Dean C. Smith, U. S. Atty., Robert M. Sweeney, Asst. U. S. Atty., Spokane, Wash., for defendants.

## MEMORANDUM AND ORDER

NEILL, Chief Judge.

Bonneville Power Administration (BPA) has filed an environmental impact statement (EIS) covering a proposed program to construct a series of power transmission lines extending from Little Goose and Lower Granite dams on the Lower Snake River to the Mid-Willamette Valley area of Oregon. As part of this energy redistribution program BPA has proposed a 500-kilowatt transmission line which will connect Lower Monumental Dam with a substation at Ashe, near Richland, Washington. BPA intends to construct this line along proposed route "D", which traverses dry and irrigated farmland owned by members of the plaintiff Columbia Basin Land Protection Association, an organization formed for the purpose of seeking an alternate route for the power line.

Having failed to persuade BPA to utilize their proposed route "E", which traverses a longer route across dry rangeland, plaintiffs seek injunctive and declaratory relief, based on the National Environmental Protection Act (NEPA), declaring BPA's impact statement inadequate and its decision to utilize route "D" arbitrary and capricious and an abuse of discretion.

Presently before the Court is plaintiffs' motion for a preliminary injunction.

The factors a Court must consider on a motion for preliminary injunction are:

(1) the significance of the threat of irreparable harm to plaintiff if the injunction is not granted;

(2) the state of the balance between this harm and the injury that granting the injunction could inflict on the defendant;

(3) the probability that plaintiff will succeed on the merits; and

(4) the public interest.

11 Wright and Miller, *Federal Practice and Procedure,* § 2948 at 430–431. In the case at bench, however, the decisive factor is plaintiffs' likelihood of success on the merits. It is clear that plaintiffs will suffer irreparable harm if the project is permitted to proceed and later found to be in violation of NEPA, for testimony at the hearing established that construction is already behind schedule and will proceed swiftly unless enjoined.[1] Further, NEPA has effectively preempted this Court's authority to balance the relative harm to the parties that would result from an injunction or to determine the public interest, for the act

> sets forth a declaration of national environmental policy and requires the Federal Government to use "all practical means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources" to achieve a wide range of environmental goals. Sec. 101, 42 U.S.C.A. § 4331.

*Trout Unlimited v. Morton,* 509 F.2d 1276, 1281 (9th Cir. 1974). *See also,* 42 U.S.C. § 4321, *Daly v. Volpe,* 376 F.Supp. 987, 992–993 (W.D.Wa.1974). Since NEPA mandates implementation of a congressionally defined policy "to the fullest extent possible", 42 U.S.C. § 4332, the relative harm to the parties that results from an injunction in furtherance of the goals of NEPA is not controlling. *Cf. United States v. San Francisco,* 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940), quoted in *Lathan v. Volpe,* 455 F.2d 1111, 1116 (9th Cir. 1971) and *Northside Tenants' Rights Coalition v. Volpe,* 346 F.Supp. 244, 248–249 (E.D.Wis.1972). Accordingly, courts have not hesitated to en-

---

1. Although counsel for the parties stipulated that condemnation of land and entry onto the land for surveying would not commence until after the hearing on plaintiffs' motion for a preliminary injunction, the protection of that stipulation has now expired.

join projects proceeding in violation of NEPA, irrespective of the damage caused by such injunctions. *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission,* 146 U.S.App. D.C. 33, 449 F.2d 1109, 1115 (1971); *Lathan v. Volpe, supra; Greene County Planning Board v. Federal Power Commission,* 455 F.2d 412, 422–423 (2d Cir.), *cert. denied,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); *Arlington Coalition v. Volpe,* 458 F.2d 1323 (4th Cir.), *cert. denied,* 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 243 (1972); *Lathan v. Volpe,* 350 F.Supp. 262, 265 (W.D.Wash. 1972). Therefore, the Court's grant or denial of plaintiffs' motion for a preliminary injunction depends on the probability that plaintiffs will succeed on the merits.

*The Basis of Plaintiffs' Attack*

Plaintiffs assert that BPA's choice of route "D" was arbitrary and capricious, constitutes an abuse of discretion, and was violative of procedure required by law. *See* 5 U.S.C. § 706(2)(A) and (D). Plaintiffs' attack is founded on defendants' alleged non-compliance with NEPA, 42 U.S.C. § 4321 *et seq.* Specifically, they assert that the EIS prepared for the project failed to comply with NEPA in the following particulars:

(1) that the EIS failed to incorporate a cost-benefit analysis comparing the alternatives to the route chosen, as required by 42 U.S.C. 4332(2)(B) and Guideline 1500.8(a)(4) of the Council on Environmental Quality (CEQ), Part 1500, Chapter 5, Title 40, "Protection of the Environment";

(2) that defendants failed to review and revise their procedures for preparation of EISs in consultation with CEQ as required by CEQ Guideline 1500.3(a);

(3) that defendants failed to fulfill their statutory duties under the National Historic Preservation Act of 1966, 16 U.S.C. 470f *et seq.,* and Executive Order 11593;

(4) that defendants failed to correlate the project and its alternatives to BPA's larger projects as required by CEQ Guideline 1500.6(d)(1);

(5) that defendants failed to adequately consult with other federal agencies and give sufficient consideration to their comments as required by 42 U.S.C. 4332(2)(C) and CEQ Guideline 1500.8;

(6) that defendants omitted material facts from the EIS concerning future additions to the proposed power line and costs of construction.

At the outset it is necessary to define the appropriate standard of review for the Court to apply in evaluating BPA's EIS. Although there has been some confusion as to whether EISs are reviewable under the "arbitrary [and] capricious" standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), or under the "without observance of procedure required by law" standard of that act, 5 U.S.C. § 706(2)(D), *Trout Unlimited v. Morton, supra* at 1282, the Ninth Circuit has held that § 706(2)(D) is the proper standard for review of the adequacy of an EIS. *Lathan v. Brinegar,* 506 F.2d 677, 693 (9th Cir. 1974), quoted in *Trout Unlimited, supra* at 1282. The question remains open whether the Court could reverse a substantive agency decision if, after reviewing the EIS and finding it adequate, the Court then concluded that the agency decision was "arbitrary, capricious [and] an abuse of discretion" in light of the information contained in the EIS. *Calvert Cliffs' Coord. Com., supra* at 1115; *Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275, 1281 (9th Cir. 1973). However, the Court need not answer this question because BPA's decision, though understandably unpopular with plaintiffs, was clearly based on legitimate economic considerations reflected in the EIS, and was not arbitrary and capricious. Hence, plaintiffs' prayer that the Court reverse defendants' decision as an abuse of discretion must be denied.

■ However, the Court must examine the EIS from a purely procedural perspective to determine whether defendants complied with the procedures of NEPA in preparing the EIS for the power line project.

If the EIS was not prepared in compliance with NEPA the Court must require defendants to prepare an adequate EIS before they can proceed with the project, *Brooks v. Volpe,* 350 F.Supp. 269, 276 (W.D.Wa.1972), but if the EIS is procedurally sound plaintiffs are without a remedy, for the Court cannot substitute its judgment for that of the agency decision-maker. *Trout Unlimited v. Morton, supra* at 1283.

. After considering the evidence presented at the hearing on the motion for preliminary injunction and carefully reviewing the EIS and other matters contained in the record, the Court is constrained to conclude there is a high probability it would find the EIS procedurally sound at the hearing on the merits. A seriatim discussion of plaintiffs' contentions follows.

### I. *Cost-Benefit Analysis*

 NEPA requires that agencies identify and develop methods and procedures, in consultation with the Council on Environmental Quality . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations; . . .

42 U.S.C. § 4332(2)(B). This provision has been construed to require "a rather finely tuned and 'systematic' balancing analysis . . . ", *Calvert Cliffs' Coord. Com., supra* at 1113, in order to provide

a basis for (a) evaluation of the benefits of the proposed project in light of its environmental risks, and (b) comparison of the net balance for the proposed project with the environmental risks presented by alternative courses of action.

*Natural Resources Defense Council v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 833 (1972). Based on the foregoing and on the testimony of plaintiffs' expert witness, plaintiffs urge that nothing less than an intricate, computerized system of analysis is required by NEPA and that, lacking this, the EIS is deficient.

However, the most recent holding of the Ninth Circuit regarding the necessity of a cost-benefit analysis is not as stringent in its requirement that costs and benefits of each alternative be analyzed and compared:

. . . there are no specific statutory requirements which would mandate the inclusion of a cost-benefit formula in the impact statement. Moreover, there is nothing in [*Calvert Cliffs' Coord. Com. v. United States A. E. Com'n., supra* and *Natural Resources Defense Council v. Morton, supra*] which suggests that a formal equation need be included as an independent requirement of NEPA nor considered under any stricter standard than any other of the determinants involved in the substantive decision to proceed with a particular project.

*Trout Unlimited v. Morton, supra* at 1286–1287, fn. 14. The test for the sufficiency of cost-benefit analysis, as set forth in *Trout Unlimited,* is whether

[t]he EIS . . . is sufficiently detailed to aid the decision-makers in deciding whether to proceed or not and to provide the information the public needs to enable both those who would challenge, and those who would support, the project to respond effectively.

509 F.2d at 1286.

The record amply demonstrates that plaintiffs and the general public were sufficiently informed by the EIS to respond effectively to the proposed action. At a December 17, 1974 public meeting concerning construction of the power line:

Primary concern voiced in the comments was on the impact of the transmission facilities upon farmland, especially in view of the fact that many new irrigation systems are now being used . . . [and] concerning the interference of transmission lines with current irrigation and farming practices . . .

EIS, Volume I at VI–1. Plaintiffs' elaborate presentation at the hearing on the motion for a preliminary injunction is further evidence of the adequacy of the EIS's cost-benefit analysis, for all of the points

argued by plaintiffs at the hearing are covered in the EIS, albeit in less detail.

## II. *Failure to Revise Agency Regulations*

Section 1500.8(a)(4) of the CEQ Guidelines, effective August 1, 1973, requires federal agencies to circulate an analysis of

> alternatives and their environmental benefits, costs and risks . . . [with] the proposed action through the agency review process in order not to foreclose prematurely options which might enhance environmental quality or have less detrimental effects.

Section 1500.3(a) requires that agencies review their procedures for preparation of impact statements and revise them as necessary to conform to CEQ Guidelines, such as that quoted above.

Although CEQ Guidelines impose mandatory duties upon federal agencies, *Trout Unlimited v. Morton, supra* at 1282, fn. 7, and BPA has not revised its regulations since the 1973 CEQ directive, it does not follow that BPA's impact statements are thereby rendered inadequate. The CEQ directive of 1973 requires revision of agency regulations only to the extent necessary to conform them to CEQ Guidelines. In the case at bench, the testimony of BPA's Environmental Manager was that revision of BPA's regulations was not necessary.

 However, the Court need not decide whether BPA's regulations should have been revised in 1973 because failure to revise such regulations would not, per se, render every EIS inadequate as a matter of law as plaintiffs assert. Although it is mandatory that CEQ directives be followed, the application of CEQ Guidelines to impact statements is merely advisory and failure to do so does not render an EIS inadequate. *Greene County Planning Board v. Federal Power Commission, supra* at 421. The test of adequacy always requires an examination of the EIS itself:

> [A]dequacy of the content of the EIS should be determined through use of a rule of reason (citations omitted). A reasonably thorough discussion of the significant aspects of the probable environmental consequences is all that is required by an EIS.

*Trout Unlimited v. Morton, supra* at 1283. In the case at bench the EIS discusses five alternative routes for the power line, including that proposed by plaintiffs, and the alternative of nonconstruction, along with the environmental impacts of each alternative. Since this includes all alternatives "reasonably related to the purposes of the project", *id.* at 1286, the EIS is not deficient in this respect. The EIS need only consider those alternatives "sufficient to permit a reasoned choice". *Life of the Land v. Brinegar*, 485 F.2d 460, 472 (9th Cir. 1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

## III. *The National Historic Preservation Act of 1966*

 NEPA requires agencies to consult with and obtain the comments of any federal agency which has expertise or jurisdiction over environmental impacts involved in a proposed project. 42 U.S.C. § 4332. The National Historic Preservation Act of 1966, 16 U.S.C. § 470f, et seq., requires that agency heads notify the Advisory Council on Historic Preservation of proposed projects and afford the Council a reasonable opportunity to comment upon any projects that may impact historic sites listed in the National Register of Historic Places. 16 U.S.C. 470f. Executive Order 11593 creates a duty for all federal agencies and specifically for the Secretary of the Interior to nominate places with historic value for the National Register.

Plaintiffs contend defendants violated NEPA by failing to fulfill the duties imposed on them by section 470f and Executive Order 11593. However, contrary to plaintiffs' contention, the testimony of BPA's Environmental Manager and exhibits introduced at the hearing amply demonstrate that BPA, although initially not in compliance, did eventually fulfill its obligations under the act and executive order.

## IV. *Failure to Correlate Alternatives to the Project*

 CEQ Guideline 1500.6(d)(1) provides:

In many cases, broad program statements will be required in order to assess the environmental effect of a number of individual actions on a given geographical area . . . or the overall impact of a large scale program or chain of contemplated projects (*e. g.* major lengths of highway as opposed to small segments).

Courts have also recognized that impact statements must consider the environmental impacts of projects as a whole and have ruled that impact statements are inadequate when they deal with projects in piecemeal segments. *Cf. Greene County Planning Board v. Federal Power Commission, supra* at 423–424; *Daly v. Volpe, supra.* Plaintiffs argue that the EIS is inadequate for failing to correlate the power transmission line project here at issue with the entire Grid Reinforcement System.

Contrary to plaintiffs' allegations, the project covered by the EIS does not represent a case of piecemeal segmentation. The testimony at the hearing established that the power line will not be expanded within the foreseeable future, which extends to the 1990's. Further, the EIS covers all of BPA's projects for fiscal years 1975 and 1976. It is not fatal to the EIS that these numerous projects are not correlated with one another, for the purpose of the EIS is to provide the information necessary for the decision-maker, other federal agencies and the public to assess the environmental impacts of the proposed project. *Trout Unlimited v. Morton, supra* at 1282. A correlation of all the projects, or of all the alternatives to the project

> would be immense, and the . . . the inevitable inability . . . to combine and discuss all such myriad combinations would be a fertile ground for legal attack and would not form the basis for informed environmental decisions.

*Daly v. Volpe, supra* at 994. The EIS is not deficient on this ground because it provides the information necessary to apprise the government and the public of the potential environmental consequences of the project and, as in this case, to effectively comment upon the effects of the proposed action.

V. *Failure to Consult with Other Federal Agencies*

NEPA requires that prior to preparing an EIS for a proposed project, a federal agency must consult with and obtain comments regarding environmental impacts from other agencies having expertise or jurisdiction with respect to the proposed project. 42 U.S.C. § 4332. Although defendants solicited comments from an impressive array of federal and state agencies, as well as from private individuals, *see* Volume I of EIS at 51–52, 56–104, plaintiffs contend BPA failed to comply with this requirement because it failed to adequately research and respond to the comments received. *See Lathan v. Volpe, supra; Sierra Club v. Froehlke,* 359 F.Supp. 1289 (S.D.Tex.1973), *rev'd on other grounds,* sub nom.; *Sierra Club v. Callaway,* 499 F.2d 982 (5th Cir. 1974).

While the EIS contains many conclusory statements in response to the many comments defendants received, this undesirable form of presentation is not fatal as long as the EIS "identifies and discusses the significant environmental impacts in sufficient detail". *Trout Unlimited v. Morton, supra* at 1284. Scientific studies may be useful aids in drafting an EIS, but they are not required. *Life of the Land v. Brinegar, supra* at 472. An examination of the EIS reveals that all adverse environmental and economic impacts raised by plaintiffs at the hearing are acknowledged and discussed in Volume I of the statement, albeit in an abbreviated or conclusory fashion: the adverse effects of the power line on aerial crop spraying, irrigation and cultivation, at 31–32; impacts on historic and archeologic sites, at 12–13; recreational impacts at 30–31; the adverse weed growth that will result at 28; impacts on wildlife at 26–27; etc. It is not necessary that the studies supporting these conclusions be included in the EIS. *Trout Unlimited v. Morton, supra* at 1284, *Life of the Land v. Brinegar, supra* at 468–469.

## VI. *Omissions of Material Fact*

Finally, plaintiffs contend that the EIS is inadequate because defendants intentionally omitted material facts concerning future additions to the power transmission line and the true costs of compensating land owners along the chosen route. However, the testimony indicated that any future plans for adding additional towers or lines to the project, or for adding a higher voltage line are not now being considered and will not be considered until the 1990's. An EIS need not discuss environmental consequences which are "improbable" or "remote and highly speculative". *Trout Unlimited v. Morton, supra* at 1283. Further, even though the costs of condemning land may be higher than defendants originally estimated, the potential difference in land cost is inconsequential in relation to the total construction costs for the project. Therefore, this "omission" or miscalculation, if any, was not material and could not significantly affect anyone's ability to accurately assess and comment upon the consequences of the project.

The Court is constrained to observe that the issues raised by this suit were probably foreseeable as an inevitable conflict between or among the beneficiaries of the massive project commonly known as the Columbia River Project. From the original concept of a multi-purpose dam at Grand Coulee to create electrical energy, control flood waters and irrigate the vast Central Washington desert to the latest addition to the generation facilities and irrigation system, there has been the potential friction created by the competing interests of use of lands for production of food and fibre and the use of those same lands for a distribution system for the electrical energy created by the project. It is ironic that the same energy generating facility, without which there would be no agricultural benefits, also creates the conflict between the users of that energy for agricultural pursuits and the agency which provides the requisite distribution system which serves these same producers of agricultural products.

The Court having considered all aspects of plaintiffs' attack on the EIS, and having found that plaintiffs are not likely to succeed on the merits of their claim that the EIS was prepared without observance of procedure required by law or that BPA's decision was arbitrary and capricious, the motion for a preliminary injunction is hereby DENIED.