**CITY OF NEW HAVEN, Plaintiff,**

v.

**John P. CHANDLER, as Division Engineer, United States Army Corps of Engineers for the New England Division, Clifford Alexander, as Secretary of the Army, and the United Illuminating Company, Inc., Defendants.**

**Civ. No. N–77–406.**

United States District Court,
D. Connecticut.

Feb. 14, 1978.

Peter N. Cooper, Sosnoff, Cooper & Whitney, New Haven, Conn., for amicus curiae, Natural Resources Defense Council, Inc.

Noel E. Hanf, and William J. Doyle, Wiggin & Dana, New Haven, Conn., for defendant United Illuminating Co.

Frank H. Santoro, Asst. U. S. Atty., New Haven, Conn., for defendants Chandler and Alexander.

## MEMORANDUM OF DECISION

DALY, District Judge.

The City of New Haven (the City) has requested that this Court permanently enjoin the construction of three electrical transmission towers being built by the defendant United Illuminating Company (the Company) in New Haven Harbor alongside the Quinnipiac Bridge (Interstate 95) under a permit issued by the defendant U. S. Army Corps of Engineers (the Corps).[1] The City argues that the permit is invalid and that the construction should therefore be enjoined because the Corps violated § 102 of the National Environmental Policy Act of 1969 (NEPA)[2] by I) failing to file an envi-

Henry L. Fisher, Deputy Corp. Counsel, City of New Haven, New Haven, Conn., for plaintiff.

1. Jurisdiction is found in 28 U.S.C. § 1331, and in 5 U.S.C. § 701 *et seq.* The City also requests a declaratory judgment, 28 U.S.C. § 2201, and an order of mandamus, 28 U.S.C. § 1361.

2. 42 U.S.C. § 4332(2) provides in relevant part:
All agencies of the Federal Government shall—
(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;
(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;
(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of the long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and

ronmental impact statement (EIS) as required by 42 U.S.C. § 4332(2)(C), II) not considering adequately the alternatives to the proposed project in contravention of 42 U.S.C. § 4332(2)(E), and III) neglecting to develop standards for the evaluation of aesthetics in violation of 42 U.S.C. § 4332(2)(B). For the reasons discussed below, the relief requested by the plaintiff is denied.

## I. BACKGROUND

The present dispute began in the nineteen-sixties, when the Company held discussions with the City regarding the construction of a transmission line connecting downtown New Haven with the 345,000 kv New England electrical grid and the proposed New Haven Harbor Station on the opposite, eastern side of the harbor. The line was to extend along nineteen towers, three of which were to stand in the harbor. In August of 1969, the Company applied to the Corps for a permit to construct three 115 kv overhead transmission towers and lines pursuant to § 10 of the River and Harbor Act of 1899, 33 U.S.C. § 403. The Corps issued a public notice regarding the application, and received over 100 objections focusing primarily on aesthetics. This application was withdrawn before a decision was rendered.

Negotiations between the Company and the City continued, as a result of which the Company agreed to modify the proposed route of the transmission line and the pole design. In 1971 the Connecticut Public Utilities Commission approved construction of the entire line after extensive hearings, and in 1974 the Connecticut Supreme Court upheld the PUC decision.[3] Within weeks of the PUC approval, the Company filed a new application with the Corps. The Company also applied to the Connecticut Department of Environmental Protection for permission to construct the three towers in the harbor. In October of 1972, the state Commissioner of Environmental Protection denied the construction permit, citing the potential aesthetic impact of the project. Because of this negative decision by the state, the Corps returned the Company's application. The City then appealed the Commissioner's decision, and won. The Superior Court Judge concluded that the decision had been based on legislation not applicable to the construction project.[4] In March of 1975, the succeeding Commissioner approved the proposal on the basis of the hearing examiner's report.[5]

On April 23, 1975 the Company reapplied to the Corps for a permit to construct three 180 feet electrical transmission towers in New Haven Harbor. The application was followed in September by an environmental report from the Company's consultant. The Corps then prepared an environmental assessment. In November of 1975 the Corps issued a public notice announcing that it had reached a preliminary determination that an EIS was not required because the environmental impact of the transmission line would not be "significant." The assessment concentrated on the water quality and land-fill questions and barely dealt with aesthetics. In response to the widely-circulated notice, those opposing the project contacted the Corps, including the City, local organizations, political leaders, and private citizens. Other federal agencies also responded. The National Ma-

shall accompany the proposal through the existing agency review processes;

.    .    .    .    .

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

3. *City of New Haven v. Public Utilities Comm'n,* 165 Conn. 687, 345 A.2d 563 (1974).

4. *United Illuminating Co. v. Commissioner of Environmental Protection,* No. 178804 (Conn. Super.Ct., Hartford Cty., Feb. 26, 1974).

5. The DEP review was based on a state statute regulating construction in navigable waterways, under which statute the agency was required to consider "the use and development of adjoining uplands, . . . the use and development of adjacent lands and properties and the interests of the state, including pollution control and recreational use of public waters . . . ." Conn.Gen.Stat. § 25–7b (Supp.1971).

rine Fisheries service informed the Corps that it "reluctantly" offered no objection to the project. The U.S. Fish and Wildlife Service reported that no significant adverse effects were expected. The U.S. Environmental Protection Agency had no comment.

As a result of the many objections to the project, the Corps held a public hearing on August 12, 1976 at which those concerned with the construction project were allowed to present their views and ask questions. A Company spokesman began the hearing. He was followed by state legislators, the Mayor of New Haven, other local political leaders, and the head of New Haven's development program, all in opposition to the project. A representative of the local Chamber of Commerce then spoke in favor of the project. Various neighborhood and environmental groups sent speakers to oppose the construction, and local citizens contributed their views. Written statements were also submitted. The National Marine Fisheries Service submitted a supplemental letter specifying the agency's concern with the impact of altered turbidity levels on the nearby oyster beds. The Corps also solicited the advice of the Department of Housing and Urban Development as to the impact of transmission lines upon urban renewal programs, and whether there were guidelines concerning such construction. HUD responded that aesthetics were an important element in urban decay, and that the towers and lines were "generally in conflict with the goals and objectives" of the local urban renewal effort. The Corps also sought further information from the Company regarding utility rates and the manner in which the Company intended to absorb the long-term costs of the project.

During the summer of 1977, the Corps attempted to reach a compromise between the opponents of the project and the Company by proposing the issuance of a permit for only 10 years, to be followed by a re-evaluation of the project. The City rejected the proposal. On September 20, 1977 the

Corps issued the construction permit subject to full review "[i]f at any time it is demonstrated that this action has caused impacts which adversely effect New Haven's redevelopment potential or are not in the overall public interest . . . ." The Corps accompanied the permit with a formal environmental assessment and findings of fact. In a letter to the Mayor of New Haven, the Division Engineer, Colonel Chandler, noted that the decision was "truly one of the two or three most difficult regulatory decisions to face us in New England." On October 21, 1977 the City filed this suit.[6] The general issue, raised in a variety of contexts, is whether in issuing the permit to construct the three transmission towers the Corps acted arbitrarily, capriciously, in abuse of discretion, or otherwise not in accordance with law. Administrative Procedure Act, § 10(e), 5 U.S.C. § 706(2)(A); *Hanly v. Kleindienst,* 471 F.2d 823, 828 (2d Cir. 1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) (*Hanly II* ); *See Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

## II. THE SIGNIFICANT IMPACT PREREQUISITE FOR AN EIS

The National Environmental Policy Act of 1969 requires that federal agencies prepare a detailed environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). All parties agree that the issuance of a permit for the construction of the transmission towers and electrical wires is a major federal action. The City argues that the construction project upon which the defendant Company has embarked will significantly damage the aesthetics of New Haven Harbor and will retard urban renewal in the nearby Fair Haven section of the city. Because the Corps neglected to file an EIS prior to granting a permit for the erection of the towers and lines, the City asks this Court to rule the permit issued by the Corps invalid, thus bringing construction to a halt.

**6.** On November 30, 1977 this Court denied the City's motion for a preliminary injunction in light of the likelihood that a decision on the merits could be reached before the occurrence of irreparable harm, *i. e.,* before the towers were erected.

■ In considering the City's request, the Court's function is not to make its own determination whether the impact is significant, but to review the Corps' action in relation to the record before it. As the Second Circuit has stated, "the responsible federal agency has a 'primary and nondelegable responsibility' to made its own comprehensive and objective evaluation of the environmental impact of a project constituting a major federal action." *Steubing v. Brinegar,* 511 F.2d 489, 496 (2d Cir. 1975). In *Hanly II, supra* at 830–31, the Second Circuit established two relevant factors that must be considered by the federal agency. First, the agency must determine "the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it." Second, the agency must consider "the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area." Review by this Court includes consideration of both process and substance. "The requirements of what they agency must consider in making the determination of whether an impact statement is necessary are governed by a rule of reason, similar to that used in determining whether certain matters must be considered in the impact statement itself." *Harlem Valley Transportation Ass'n v. Stafford,* 500 F.2d 328, 337 (2d Cir. 1974). Thus this Court must determine whether the Corps took the "hard look" at the environmental impact of the project necessary for a reasoned evaluation. *See County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368, 1375 (2d Cir. 1977); *Natural Resources Defense Council v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 838 (1972). Furthermore, if the record is found sufficient, this Court must determine whether the Corps abused its discretion in concluding that the project would not significantly effect the environment. *Hanly II, supra* at 828–30.

■ The City argues that the general aesthetic impact of the project and the specific impact upon local urban renewal efforts deserved closer attention. Aesthetics is clearly a factor that must be considered by the Corps in determining whether the environmental impact of a project is significant. The NEPA was meant "to assure for all Americans safe, healthful, productive, and *aesthetically* and culturally pleasing surroundings." 42 U.S.C. § 4331(b)(2) (emphasis added). Aesthetic damage to the environment has played a major role in the decisions of the Second Circuit. *See, e.g., Steubing v. Brinegar, supra* at 496; *Scenic Hudson Preservation Conference v. FPC,* 453 F.2d 463 (2d Cir. 1971), *cert. denied,* 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972) *(Scenic Hudson II); Scenic Hudson Preservation Conference v. FPC,* 354 F.2d 608 (2d Cir. 1965), *cert. denied sub nom. Consolidated Edison Co. of New York v. Scenic Hudson Preservation Conference,* 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966) *(Scenic Hudson I).* Cases in which such considerations have received less emphasis are generally those in which the negative impact was clearly minimal. *Compare Hanly v. Mitchell,* 460 F.2d 640, 646 (2d Cir.), *cert. denied sub nom. Hanly v. Kleindienst,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) *(Hanly I ),* and *Maryland-National Capitol Park and Planning Comm'n v. U.S. Postal Service,* 159 U.S. App.D.C. 158, 487 F.2d 1029, 1028–39 (1973). Aesthetic effects, however, are difficult to measure, in contrast to such problems as noise, or the pollution of air or water. *Cf. Hanly II, supra* at 833 & n.10 (psychological and sociological effects of prison upon surrounding neighborhood). But the elusive character of aesthetics does not mean that such concerns are less weighty. Rather, the impossibility of quantification means, at most, that a finding as to the role of aesthetics need not be supported by statistical evidence. *See Cape Henry Bird Club v. Laird,* 359 F.Supp. 404, 414 (W.D.Va.1973), *aff'd,* 484 F.2d 453 (4th Cir. 1973).

An examination of the procedural history of the Corps' action shows that it was well aware of the aesthetic damage that might be caused by the towers. Indeed, most of the Corps' efforts subsequent to the publi-

cation of the preliminary findings in 1975 were directed at that problem. This was not a case of a federal agency accepting the conclusory assertions of the applicant. See *Goose Hollow Foothills League v. Romney*, 334 F.Supp. 877 (D.Or.1971). Complaints about the appearance of the proposed transmission lines were freely aired at the public hearing. The final Environmental Assessment is almost entirely devoted to aesthetics, and exhibits a balanced approach to the question. The assessment is a frank discussion of the issues, without advocacy. The probable effect of the transmission line was examined from a variety of vantage points, including Interstate 95, the Long Wharf industrial park, and Fair Haven. Colonel Chandler, as well as numerous members of his staff, visited the area. The significance of this on-site investigation was highlighted by this Court's own tour of the area, which impressed upon the Court the difficulty of appreciating the already heavily industrialized character of the harbor on the basis of documentary exhibits.

The City's stronger argument is that the Corps failed to investigate adequately the impact of the project upon urban redevelopment. However, the Corps received numerous written statements, as well as live testimony, regarding the renewal plans of the City. Both the Redevelopment Plan for the Long Wharf Redevelopment Area (as amended 1974), and the Fair Haven Renewal and Redevelopment Plan (as amended 1975), were introduced into the administrative record. Furthermore, the Corps carefully formulated a request for supplemental information from the Department of Housing and Urban Development. The only new material submitted by the City in support of its request for a permanent injunction is the Long Island Sound Study, an inter-governmental report completed in 1975. But the most relevant portions of this study were brought to the Corps' attention at the public hearing. The fact that the City has failed to submit significant new evidence suggests that the scope of the Corps' consideration was fairly complete. *See Columbia Basin Land Protection Ass'n v. Kleppe*, 417 F.Supp. 46, 50–51 (E.D.Wash.1976).

This Court finds that the Corps conducted a sufficient, good faith investigation into the aesthetic impact of the Company's proposal. To be sure, a determination that the Corps went far enough in its environmental investigation depends in part on a finding that the evidence before the Corps was convincing enough to obviate further research. It is the character of the evidence before the Corps to which this Court now turns.

In examining the Corps' finding that the environmental impact would not be significant, the Corps' judgement should receive wide respect. Mere disagreement as to the weight of the evidence is not enough. *County of Suffolk v. Secretary of the Interior, supra,* 562 F.2d at 1383. *See Kleppe v. Sierra Club, supra,* 427 U.S. at 410 n.21, 96 S.Ct. 2718. The Corps is "not required to give the same weight to plaintiffs' concerns as plaintiffs do." *Hanly I, supra* at 648. As already noted, the administrative record is lengthy and includes not merely transcripts and written testimony, but also numerous maps and photographs depicting the proposed transmission lines.

There were three locations from which the project was evaluated. First, the impact on substantial investments in the Long Wharf area was found minimal. Seen from that area, the power lines would raise the horizon formerly created by the highway bridge. But the towers would be distant, and would be dominated by the much larger, multicolored New Haven Gas Co. storage tower and the six smokestacks of the defendant's English Station. Furthermore, a view of the overhead wires would also encompass the numerous oil storage tanks on the opposite shore, as well as another electrical plant and other transmission lines. The Corps' finding that the impact upon the Long Wharf area would be negligible is clearly supported by the evidence.

The Corps also considered the impact of the project on those individuals driving along I–95, a matter of no small importance considering the thousands of bridge crossings made each day. The planned transmis-

sion towers and lines will not attract the eastbound motorist's attention while passing the Long Wharf area. As the automobile nears the bridge, the gas storage tower and smokestacks will still dominate the scene. Only when driving across the bridge would the motorist focus upon the new lines. The effect would be brief. No view of New Haven would be interrupted, and the industrial impression would be consistent with the surroundings at both ends of the bridge. The experience of motorists travelling westward would be similar. These people will have to drive past other power lines and oil tanks before reaching the bridge. When these motorist are on the bridge, their limited view of the local landmark of East Rock—limited by the guardrails and by the necessity of keeping careful watch on the surrounding traffic on the shoulderless bridge—will be further obscured by the transmission lines. The existing view is, at best, fleeting. A finding that the effect of the proposed line on motorists travelling along I–95 would be negligible is thus supportable.

In relation to the third major area of aesthetic impact, Fair Haven, the Corps also concluded that the adverse effects would be minimal. Here, the evidence was conflicting. The effect on Quinnipiac Park, an open space bordering the harbor and in plain view of the proposed transmission line, would be minimized by the planting of trees along the edge of the park. The on-site investigation by the Corps revealed that the towers were only visible to the industrial outskirts of Fair Haven facing the harbor. Furthermore, the redevelopment plan indicated that those areas were to remain industrial and that under existing zoning laws the transmission line was consistent with nearby land uses. As the Second Circuit noted in *Hanly II, supra* at 831, "[w]here conduct conforms to existing uses, its adverse consequences will usually be less significant than when it represents a radical change." Finally, the state Depart-

ment of Environmental Protection had authorized the harbor project, and the Public Utilities Commission had approved the entire line, including a number of structures visible from Fair Haven residential areas. The importance of these approvals was articulated by the Court of Appeals for the District of Columbia Circuit; if state regulation permits the construction, then the environmental effects "will be no greater than demanded by the residents acting through their elected representatives." *Maryland National Capitol Park & Planning Comm'n v. U.S. Postal Service, supra* at 1036. Given this evidence alone, the Corps would undoubtedly have been justified in concluding that both the increased and the cumulative effects upon Fair Haven's renewal effort would be insignificant.

■ However, the Corps also had to consider the strenuous objections of those charged with the leadership of the development plans. As the Mayor of New Haven testified, successful urban renewal is the result of a "fragile coalition." A slight change in the local environment may be significant.[7] In addition, the response from HUD, a major disinterested agency, was unfavorable. Although this evidence may well have justified a finding that the environmental impact would be significant, this Court cannot find as a matter of law that the evidence demanded it. The City argues that the continued local opposition to the project, the extensive litigative history, and the original denial of a permit by the former state Commissioner of Environmental Protection constituted facts of such importance the the Corps was required to find the project significant. The City cites a guideline of the Council on Environmental Quality, 40 C.F.R. § 1500.6 (1976), which states that an EIS should be compiled for every major action, the environmental impact of which is likely to be "highly controversial." But the term "controversial" has

---

7. The Second Circuit in *Hanly v. Kleindienst,* 471 F.2d 823, 831 (2d Cir. 1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973), noted that if "an entire neighborhood is in the process of redevelopment," the proposed action might significantly damage the environment even though seemingly consistent with the surrounding area.

been interpreted to mean a substantial dispute over the actual effect of the action, rather than merely the existence of continued local opposition. *See Hanly II, supra* at 8:30 & n.9A; *Rucker v. Willis,* 484 F.2d 158, 163 (4th Cir. 1973).[8] Although local officials opposed the project, local land use policies condone the construction, and state authorities have already approved it. Even the HUD response is subject to interpretation. The letter is phrased in vague terms, and a fact-finder could justifiably interpret the letter as concluding that the construction of the towers and lines would conflict with the "general objectives" of the renewal plan because unattractive edifices always hurt redevelopment. If the Corps were to find a significant environmental impact on the basis of this letter, nearly every industrial project would be found significant. As a result, the evidence cannot be said to require a result different from that reached by the Corps.[9]

■ This brief discussion of the evidence before the Corps is meant to show that the Corps' decision not to file an EIS was the result of an adequate factual investigation, and is supported by the evidence. In examining the foundation of the Corps' decision, this Court did not limit itself to the specific language of the formal assessment and of the findings of fact. Such a restrictive review is more appropriately reserved for an EIS, in which the federal agency is required to include a complete written analysis. When evaluating a threshold decision regarding the significance of the environmental impact, the entire record must be examined. The focus is on the evidence and the decision, rather than on any single document. Finally, the

burden on. the Corps to investigate thoroughly must be looked at in the context of the threshold determination. An environmental impact statement is definitive. A threshold decision requires something less. The Corps' conduct met this lesser standard.

## III. INVESTIGATION OF ALTERNATIVES UNDER 42 U.S.C. § 4332(2)(E)

■ Plaintiff's second major argument is that the Corps failed to investigate sufficiently alternative methods of transferring the electricity. The City bases this argument on 42 U.S.C. § 4332(2)(E), which states that all federal agencies shall "study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." This requirement is independent of the agency's duty to file an EIS. *Trinity Episcopal School Corp. v. Romney,* 523 F.2d 88, 93 (2d Cir. 1975); *Hanly II, supra* at 834. Specifically, the City claims that the Corps neglected to consider the complete abandonment of the proposed construction project, failed to investigate adequately the underground and underwater alternatives to overhead wires, and dismissed without justification the possibility of hanging the wires beneath the I–95 bridge.

■ Once again, the standard to be applied is the rule of reason. *East 63rd St. Ass'n v. Coleman,* 414 F.Supp. 1318, 1326 (S.D.N.Y.1976), *aff'd,* 538 F.2d 309 (2d Cir. 1976). As required when preparing an EIS, "the discussion of environmental effects of alternatives need not be exhaustive. What is required is information sufficient to per-

---

8. The CEQ Guidelines are meant to be only advisory. *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421, 426 (5th Cir. 1973); *Greene County Planning Bd. v. FPC,* 455 F.2d 412, 421 (2d Cir. 1972). In *Hanly v. Kleindienst, supra* note 7, at 831–32, the Court of Appeals rejected an interpretation of § 4332(2)(C) that would require an EIS when the impact was "arguably" significant, preferring to maintain the more rigorous threshold and leaving the decision whether to compile an EIS in a close case to administrative prudence.

9. 33 C.F.R. § 320.4(j)(4), 42 Fed.Reg. 37,138 (July 19, 1977), provides that "[i]n the absence of overriding national factors of the public interest . . . a permit will generally be issued following receipt of a favorable State determination . . . ." The City claims that the Corps felt compelled by this section to approve the project. A careful reading of the findings of fact, however, reveals that the Corps referred to this provision only after determining that the environmental impact was not significant.

mit a reasoned choice of alternatives so far as environmental aspects are concerned." *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 14, 458 F.2d 827, 836 (1972). Sole reliance on the evidence submitted by the Company as to the feasibility of other alternatives would be improper. *See, e. g., Trinity Episcopal School Corp. v. Romney, supra* at 94; *Greene County Planning Bd. v. FPC,* 455 F.2d 412, 420 (2d Cir.), *cert. denied,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). In the present case, there was little discussion of 'abandoning the project entirely. Indeed, the record includes considerable evidence of the need for a more reliable and efficient source of power to downtown New Haven, including the finding of the Connecticut Public Utilities Commission that such a project was needed. This evidence was enough to justify the Corps' decision not to seek further data regarding the possibility of abandoning all construction of the transmission line.[10]

■ The debate as to alternative methods of transmitting the electricity across the harbor was spirited, with experts aligned on both sides. In relation to the underground and underwater alternatives, the City's expert was critical of the cost comparisons submitted by the Company. However, following a meeting with the Company, the expert concluded that the cost estimates were reasonably accurate, although not as complete as he would have liked. The City's expert also considered necessary a more thorough discussion of alternative cable systems. The Company responded in detail to these criticisms, and identified what it considered to be the best alternative—a pipe-type, self-cooled system.[11] But the Company went on to explain its reasons for rejecting this alternative, including the substantially higher

costs, the difficulty and duration of repairs, the more immediate harm to the river's ecology, the problem of disposing of the dredge material, and the lingering aesthetic problems. The earlier finding of the state Public Utilities Commission that overhead lines were notably less costly had been upheld by the Connecticut Supreme Court. *See City of New Haven v. Public Utilities Comm'n,* 165 Conn. 687, 711, 715, 345 A.2d 563 (1974). On the basis of this evidence, the Corps concluded that no further investigation of the underwater and underground routes was warranted.

This Court is reluctant to rule as a matter of law that the Corps should have sought even more detailed discussion of alternatives. This reluctance is reinforced by the failure of the City to present to the Court alternative means of transmitting the needed electricity not brought to the Corps' attention. Admittedly, the City should not be made to shoulder the burden of proving the existence of other, preferable means. But the City has failed even to suggest other methods not considered during the administrative process, and the record does not indicate any significant gap in the debate. Furthermore, the evaluation of alternatives in this case is a highly technical matter better left to those with the skills and experience to consider them. In sum, the Corps did not accept a "blanket generalization unsupported by the evidence," *Trinity Episcopal School Corp. v. Romney, supra* at 94, and the record provided the Corps with enough evidence "to make a reasoned choice between alternatives," *County of Suffolk v. Secretary of the Interior, supra* at 1375. Therefore this Court finds that the Corps' investigation of the underground and underwater alternatives to the proposed overhead transmission lines was sufficient under 42 U.S.C. § 4332(2)(E).

10. The City also claims that the Corps arbitrarily determined that the transmission lines were consistent with the "public interest." 42 Fed. Reg. 37,136 (July 19, 1977) (to be codified at 33 C.F.R. § 320.4(a)). In light of the wide discretion afforded the Corps, and the substantial record upon which the exercise of that discretion was based, this Court rejects the City's allegation of arbitrary action.

11. The Company explained in writing its reasons for rejecting the use of a self-contained oil-filled system, a compressed-gas cable, an extruded cable, and a pipe-type but force-cooled system.

The City also argues that the Corps should have looked more closely at the possibility of suspending the electrical wires from the I–95 bridge. The Corps dismissed this alternative because it interpreted the federal regulations as prohibiting that alternative. Despite the claim of the plaintiff that the suspension of the power lines is permitted, it appears that the current regulations severely restrict the use of highway bridges as support for utility cables. In order to justify suspension from the I–95 bridge, the alternatives must be "extremely difficult and unreasonably costly to the utility consumer." 28 C.F.R. § 645.206(e) (1977). In the present situation, the use of transmission towers is feasible and possibly the least expensive method. Thus the regulations seem to prohibit the use of the highway bridge.[12]

The City's argument goes one step further. Even if the regulations prohibit an alternative form of construction, the City claims that the Corps still has the duty to investigate the possibility of regulatory reform. It is true that when compiling an EIS a federal agency has a duty to go beyond the legislative status quo in investigating alternatives. *Natural Resources Defense Council v. Morton, supra,* 148 U.S. App.D.C. at 15, 455 F.2d at 837. But the existence of legislative or regulatory barriers to a proposed alternative may counsel against an in-depth review. *County of Suffolk v. Secretary of the Interior, supra* at 1367; *Natural Resources Defense Council v. Callaway,* 524 F.2d 79, 93 (2d Cir. 1975). The evidence before the Corps was not limited to the federal highway regulations.

There also was testimony that suspension would create aesthetic problems, and the difficulties of this alternative were discussed in light of a project in Seattle, Washington. Finally, the Corps considered this alternative in the context of its finding that the environmental impact of the construction would not be significant. Although the agency's duty to consider alternatives under § 4332(2)(E) is independent of the duty to file an EIS, it must be looked at in relation to the nature of the proposed project, including its estimated environmental impact. Because the impact was found not to be significant, there would seem to be a lesser responsibility to seek legislative or regulatory reforms. In this case, the proposed project is not of such magnitude that either legislators or agencies would be likely to alter the existing legal framework. *See Natural Resources Defense Council v. Morton, supra,* 148 U.S.App.D.C. at 13, 458 F.2d at 835, 838. As a result, this Court finds that the Corps' failure to further investigate the alternative of suspending the transmission cables from the I–95 bridge did not violate 42 U.S.C. § 4332(2)(E).

## IV. METHODS AND PROCEDURES UNDER 42 U.S.C. § 4332(2)(B)

Section 4332(2)(B) mandates that federal agencies shall "identify and develop methods and procedures, in consultation with the Council on Environmental Quality . . . which will ensure that presently unquantified environmental amenities may be given appropriate consideration in decision-making along with economic and technical considerations." The City complains that the

---

12. This section states that the utility companies considering the use of "Federal-aid freeways, including Interstate highways, shall meet the requirements of the AASHO [American Association of State Highway and Transportation Officials] "Policy on the Accommodation of Utilities on Freeway Rights-of-Way." This Policy establishes the threshold test mentioned in the text. The section also states that "[a]pplication of joint development and multiple-use concepts dictates that maximum use of the highway be made for other purposes where such use does not adversely affect the design, construction, integrity, and operational characteristics of the freeway." However, Appendix A

to 23 C.F.R. Part 645 explains that the joint development and multiple use concepts do not apply to freeway bridges, and do not modify the AASHO requirements. Finally, 23 C.F.R. § 645.206(g)(1) permits cable suspension when there is no "feasible or prudent alternative," and other locations are "less desirable from the standpoint of visual quality." However, this section applies to "areas of scenic enhancement and natural beauty," including "scenic strips, overlooks, rest areas, recreation areas . . . and . . . public parks and historic sites." Clearly, this section is inapposite to an industrially zoned harbor.

procedures followed by the Corps in granting a permit to the Company violated this provision. Basically, the plaintiff complains that the Corps had no regular system through which aesthetic problems could be properly analyzed, therefore the permit should be declared invalid.

In *Hanley II*, the Second Circuit declared that § 4332(2)(B) applied independently of the duty to file an EIS. This statute, the Court of Appeals continued, "requires that some rudimentary procedures be designed to assure a fair and informed preliminary decision." *Hanly II, supra* at 835. The Court held that notice of the proposed action, and the acceptance by the agency of all pertinent information offered, were the minimum procedural prerequisites. *Id.* at 836. The Court of Appeals refused to require a public hearing, and concluded that the particular procedural steps should be left to the agency. *Id.* The City, however, appears to be asking not merely for procedural safeguards, but for substantive rules of analysis.

A similar claim was raised in *Environmental Defense Fund, Inc. v. Corps of Engineers*, 492 F.2d 1123 (4th Cir. 1974). The plaintiff argued that under § 4332(2)(B) the Corps was required to develop a "scheme of values" that would permit a regular cost-benefit analysis of formerly unquantifiable environmental effects. The Court of Appeals rejected the argument, declaring that "[s]ubsection (B) cannot be fairly read to command an agency to develop or define any general or specific quantification process." *Id.* at 1133. Rather, the provision merely required that "an agency search out and develop and follow procedures reasonably calculated to bring environmental factors to peer status with dollars and technology in their decision making." *Id. See Cape Henry Bird Club v. Laird, supra*, 359 F.Supp. at 414. As a result, the procedures followed by the Corps of Engineers in compiling an EIS were held sufficient.

In light of this precedent, the City's claim is untenable. The "methods and procedures" required are those which will ensure that important environmental consid-erations will not be overlooked. The NEPA does not require detailed, substantive rules to evaluate environmental interests. Further experience in the environmental area may lead to the invention and subsequent widespread use of particular methods of evaluating presently unquantifiable factors. Such a development is to be encouraged, but it is not required by law.

Accordingly, the request for a permanent injunction is DENIED.