509 F.2d 1276
 7 ERC 1321, 5 Envtl. L. Rep. 20,151
 TROUT UNLIMITED et al., Plaintiffs-Appellants,
and
Randy Berry, Plaintiff-Intervenor-Appellant,
v.
Rogers C. B. MORTON, Secretary of the Department of the
Interior of the United States of America, et al.,
Defendants-Appellees,
and
Fremont-Madison Irrigation District and Madison County, a
political subdivision of the State of Idaho,
Defendants-Intervenors Appellees.
 No. 74--1974.
 United States Court of Appeals,
Ninth Circuit.
 Dec. 23, 1974.
 
 Allen W. Stokes, Jr. (argued), of Sierra Club Legal Defense Fund, Inc., Denver, Colo., for plaintiffs-appellants.
 Neil Proto (argued), Appellate Sections, Lands and Natural Resources Division, Dept. of Justice, Washington, D.C., for defendants-appellees.
 William S. Holden, Esq. (argued), Idaho Falls, Idaho, for defendants-intervenors.
 Before KILKENNY and SNEED, Circuit Judges, GRAY,* District Judge.
 OPINION
 SNEED, Circuit Judge:
 
 
 1
 Appellants appeal from a judgment holding the environmental impact statement for the Teton Dam and Reservoir Project adequate under the National Environmental Policy Act, 42 U.S.C.A. § 4321 et seq., and denying injunctive relief against further construction. We affirm the judgment of the district court.
 
 Parties
 
 2
 Appellants, plaintiffs below, are five environmental organizations,[1] an Idaho corporation which operates float trips and other excursions on various rivers in Idaho, and two named individuals who claim a recreational interest in the Teton River. Plaintiff-intervenor Randy Berry is a guide and outfitter who has conducted float trips on various portions of the river. Some, if not all, of the plaintiffs have standing to bring this action. In any event, standing is not at issue in this appeal.
 
 
 3
 Appellees, defendants below, are the Secretary of the Interior and four named officials of the Bureau of Reclamation who are charged with various responsibilities in the planning and implementation of the Teton Dam and Reservoir Project. Defendant-intervenor Fremont-Madison Irrigation District has, by contract with the Bureau of Reclamation, subscribed for 100 percent of the active storage capacity of the Teton Reservoir and obligated itself to repay certain portions of the costs of construction and costs of maintenance and operation properly allocable to irrigation. Madison County is an additional defendant-intervenor.
 
 The Teton Dam and Reservoir Project
 
 4
 There was evidence before the district court to support the following statement of facts.
 
 
 5
 The Teton River is formed near the town of Victor, Idaho at the upper end of Teton Valley by the confluence of Trail Creek and Little Pine Creek. The river flows north from Victor for approximately 15 miles and then descends into a narrow canyon and flows northward for eight miles. It then turns abruptly westward and flows through another 22 miles of canyon. Approximately four miles downstream from the canyon mouth, the river divides into the North and South Forks of the Teton River. Each of these forks is approximately eight miles in length and each enters Henry's Fork of the Snake River near Sugar City, Idaho.
 
 
 6
 The Teton River is a source of severe flooding in Madison County, Idaho and the surrounding areas. Annual spring flooding causes extensive damage to bridges, roadways, and private property. The Bureau of Reclamation has concluded that the proposed Teton Dam is the only practicable means to control this flooding.
 
 
 7
 In 1964, Congress enacted Public Law 88--583, 78 Stat. 925, which authorized construction of the 'First Phase'[2] of the Lower Teton Division of the Teton Basin Project.[3] The principal facilities planned are a dam and reservoir. The damsite is some three miles upstream from the mouth of the 22 mile long canyon of the Teton River and approximately 18 miles northeast of the City of Rexburg, Idaho. The Teton Dam will be an earth fill structure, approximately 300 feet high, 3000 feet wide, and 35 feet thick at the top. The reservoir will inundate approximately 17 miles of the canyon and have a storage capacity of approximately 300,000 acre feet of water, of which approximately 200,000 acre feet will be active capacity and 100,000 acre feet will be a permanent pool. It will have a shore line of some 50 miles and a water surface area, when full, of 2,100 acres.
 
 
 8
 Additional facilities include a power plant consisting of two 10,000 kilowatt units and a pumping plant with a capacity of 70 cfs (cubic feet per second) which will discharge water through a buried pipeline to the Fremont Pump Canal. This open canal will be 2.5 miles long and will provide supplemental water for some 4,000 irrigated acres through the Canyon Creek Canal. Additional irrigation water will be provided through a buried pipeline and open canal which will connect with the existing Enterprise and East Teton Feeder Canals. A system of approximately 27 deep wells will be developed throughout the valley to provide replacement irrigation water when no uncommitted surface water is available in the Upper Snake River Basin. Through direct service and water exchange arrangements, the reservoir and wells will provide supplemental irrigation water for approximately 107,000 acres. Additionally, an electric transmission line, switchyard, and a construction and maintenance building will be constructed. Bids for construction of the 'First Phase' of the project were opened on October 29, 1971, approximately 30 days after appellants filed their original complaint in the district court. The construction contract was awarded on December 14, 1971. As of March 20, 1974, construction of the overall project was approximately 50% complete.
 
 
 9
 The principal benefits which will be derived from this project are flood control and storage of irrigation water. Secondary or incidental benefits include production of electric power estimated at 92,300,000 kilowatt-hours per year and opportunities for flatwater recreation on the reservoir.
 
 
 10
 Significant environmental damage will also occur. The area of the canyon to be inundated is a winter range for mule deer. Winter counts by the Idaho Fish and Game Department have recorded about 400 deer wintering in the affected area. This area is also home to a small number of elk, various small mammals, and numerous birds, including a few bald and golden eagles, turkey vultures, and prairie falcons. Some ducks also winter in the canyon.
 
 
 11
 The Teton River is presently an excellent fishing stream for cutthroat, rainbow, and brook trout although it is little used by sportsmen because of its limited accessibility. The 17 miles of the river canyon which will be inundated will wipe out this stream fishery. However, a kokanee salmon and rainbow trout fishery will be established in the reservoir.
 
 
 12
 In April 1971, a draft environmental impact statement (hereinafter EIS) was prepared on the First Phase of the project under the direction of the Regional Director of Region One of the Bureau of Reclamation. In this preparation the personnel of the Bureau had available to it various studies of the area prepared by certain Federal agencies and other organizations having appropriate qualifications.[4] The draft was distributed to the appropriate federal, state and local agencies, as well as to many private organizations and individuals for review and comment. Approximately one hundred and fifty comments were received.
 
 
 13
 In June 1971, the EIS was revised in response to both these comments and the guidelines issued by the Council on Environmental Quality.[5]
 
 
 14
 The revisions reflected a decision to relocate the borrow area for dirt-fill used in the construction of the damsite. The Draft EIS had articulated the intent to borrow material in the canyon bottom, downstream from the damsite. However, the Final EIS revealed that a plan had been devised to obtain these materials from the designated reservoir area in order to avert environmental damage to the downstream water quality. Another revision indicated that the release of water flow was to be increased from 150 cfs to 300 cfs in order to preserve the aquatic habitat and related fishery.
 
 
 15
 Additionally, spawning facilities and hatchery flows, fish screens for new and existing canal headings, wildlife protective fencing, browse planting on 700 acres, and an acquisition of 430 acres of wildlife habitat were added in the plan to minimize the loss of fish and wildlife resulting from the dam construction and inundation.
 
 
 16
 Subsequently ten copies of the Final EIS for the project were prepared by the United States Department of Interior. All of the above mentioned proposals were adopted in the Final EIS and copies were forwarded to the Chairman of the Council on Environmental Quality, on July 22, 1971.[6] See CEQ Guidelines 36 Fed.Reg. 7724 (Apr. 23, 1971), guideline numbers 3 and 10.
 
 
 17
 On September 27, 1971, appellants in August 1971. These comments were then referred by CEQ to the Department of Interior. In September of 1971, the Department of Interior submitted to CEQ a detailed response to the EPA comments. CEQ never registered any objections to the adequacy of the EIS nor the continued construction of the project.
 
 Proceedings Below
 
 18
 On September 2m, 1971, appellants filed this action for injunctive relief in the United States District Court for the District of Idaho. On October 1, 1971, appellants filed their First Amended Complaint alleging that defendants had violated numerous laws and moved for a preliminary injunction enjoining further construction of the Teton Dam and Reservoir. Following a hearing, the district court denied such motion on March 2, 1972.
 
 
 19
 On April 4, 1972, appellants filed a motion for a Temporary Restraining Order and a second motion for a preliminary injunction. The motion for a temporary restraining order was heard on April 12 and denied on April 19, 1972.
 
 
 20
 On May 12, 1972, appellants filed their Second Amended Complaint containing five claims and seeking injunctive, declaratory, and other relief. Appellants alleged, inter alia, that the Final EIS prepared by appellees was inadequate under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C.A. § 4321 et seq. Defendants-intervenors moved to dismiss the Second Amended Complaint on June 14, 1972. A hearing was held on this motion on August 24. On September 29, 1972, the district court ordered all claims dismissed except for the claimed violation of NEPA.
 
 
 21
 Trial was held from June 25 through July 2, 1973. On January 24, 1974, Judge Fred M. Taylor issued Findings of Fact and Conclusions of Law, finding that the Final EIS complied with the requirements of NEPA. Specifically, the court concluded that (1) the EIS prepared for the 'First Phase' complied with NEPA, 42 U.S.C.A. § 4332(2)(C); (2) no EIS need be prepared as to the 'Second Phase' of the project, since no feasibility finding had yet been made by the Secretary of the Interior; and (3) that no irreparable injury had been established as to the plaintiffs. On February 13, 1974, Judge Taylor entered his order denying permanent injunctive relief. This appeal followed.
 
 
 22
 On February 20, 1974, appellants filed a motion for injunction pending appeal which was denied by the district court on March 20, 1974. Appellants then sought an injunction pending appeal in this court. This motion was consolidated with the appeal. Oral argument was heard on August 14, 1974, and the case was submitted for decision.
 
 
 23
 Appellants argue that the Final EIS fails to meet NEPA requirements in four respects: (1) it does not adequately detail the environmental impacts of the project; (2) it fails to discuss the environmental impact of the 'Second Phase' of the project; (3) it does not adequately discuss alternatives to the project; and (4) it does not include and thoroughly discuss a benefit-cost ratio for the project. We affirm the judgment of the district court in all respects.
 
 The National Environmental Policy Act
 
 24
 NEPA sets forth a declaration of national environmental policy and requires the Federal Government to use 'all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources' to achieve a wide range of environmental goals. Sec. 101, 42 U.S.C.A. § 4331. To advance this policy, Section 102(2) of the Act, 42 U.S.C.A. § 4332(2)(C), requires that all agencies of the Federal Government:include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--
 
 
 25
 (i) the environmental impact of the proposed action;
 
 
 26
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented;
 
 
 27
 (iii) alternatives to the proposed action;
 
 
 28
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and
 
 
 29
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.[7]
 
 
 30
 The purposes intended to be served by this 'detailed statement', the EIS, basically are two. First, it should provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in light of its environmental consequences. See Calvert Cliffs', Coord. Comm. v. A.E.C., 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). Secondly, the impact statement should provide the public with information on the environmental impact of a proposed project as well as encourage public participation in the development of that information.[8] See, e.g., E.D.F. v. Corps of Engineers, 325 F.Supp. 749, 759 (E.D.Ark.1971), dismissed 342 F.Supp. 1211, aff'd 470 F.2d 289 (8th Cir. 1972).
 
 Standard of Review
 
 31
 The proper standard by which to review the adequacy of the EIS has been the subject of some confusion in this court. The nature of the confusion has been whether the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the 'arbitrary, capricious, an(d) abuse of discretion' standard, or § 706(2)(D), the 'without observance of procedure required by law' standard or some third standard not precisely conforming to either § 706(2)(A) or § 706(2)(D) is the proper standard. See Environmental Defense Fund v. Armstrong, 487 F.2d 814 (9th Cir. 1973); Life of the Land v. Brinegar, 485 F.2d 460 (9th Cir. 1973); Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275 (9th Cir. 1973). This confusion was eliminated from our law by Lathan v. Brinegar, 506 F.2d 677 (9th Cir. 1974). We held that the § 706(2)(D) standard was the proper one because NEPA is essentially a:
 
 
 32
 procedural statute. Its purpose is to assure that, by following the procedures that it prescribes, agencies will be fully aware of the impact of their decisions when they make them. The procedures required by NEPA, 42 U.S.C.A. § 4332(2)(C), are designed to secure the accomplishment of the vital purpose of NEPA. That result can be achieved only if the prescribed procedures are faithfully followed; grudging pro forma compliance will not do. We think that the courts will better perform their necessarily limited role in enforcing NEPA if they apply § 706(2)(D) in reviewing environmental impact statements for compliance with NEPA . . . Lathan v. Brinegar, supra, at 693.
 
 
 33
 The 'without observance of procedure required by law' § 706(2)(D) standard, however, is less helpful in reviewing the sufficiency of an EIS than one might wish. Its difficulty lies in the fact that the 'procedure required by law' by which the sufficiency of the EIS is measured consists substantially of judicial responses to specific allegations of insufficiency directed at specific impact statements prepared in connection with particular projects that were challenged in various federal courts. Neither NEPA nor the 'Guidelines' of the Council on Environmental Quality set forth sufficiently comprehensive 'procedures' to obviate the necessity to resort to such judicial responses. The consequence has been and, to a degree, is that the judicial review of the adequacy of an EIS employs standards fashioned to meet the needs of the particular case in which the standards are applied. In due course the presence of a large volume of case law and the principle of stare decisis will yield reasonably precise 'procedural rules' by which the adequacy of an EIS can be measured. That time, however, has not arrived.
 
 
 34
 It follows, therefore, that in determining whether the appellees prepared an adequate EIS we will be guided in large part by 'procedural rules' rooted in case law. No synthesis of these rules will be attempted other than to point out that all such rules should be designed so as to assure that the EIS serves substantially the two basic purposes for which it was designed. That is, in our opinion an EIS is in compliance with NEPA when its form, content, and preparation substantially (1) provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in the light of its environmental consequences, and (2) make available to the public, information of the proposed project's environmental impact and encourage public participation in the development of that information.
 
 
 35
 We shall now turn to the specific allegations of the appellants with respect to the adequacy of the EIS. Our disposition of these allegations is based on a thorough review of the record in which the determination of the trial court, which appears to have employed the 'arbitrary and capricious' § 706(2)(A) standard of review, is not accorded the weight to which it might otherwise be entitled had the proper standard been employed.
 
 Lack of Detail
 
 36
 Appellants urge that the EIS is inadequate because it fails to discuss many possible environmental consequences. Many of these consequences while possible are improbable. An EIS need not discuss remote and highly speculative consequences. EDF v. Corps of Engineers, 348 F.Supp. 916, 933 (N.D.Miss.1972), aff'd, 492 F.2d 1123 (5th Cir. 1974). This is consistent with the (CEQ) Council on Environmental Quality Guidelines and the frequently expressed view that adequacy of the content of the EIS should be determined through use of a rule of reason. Lathan v. Brinegar, supra; EDF v. Corps of Engineers, 492 F.2d 1123 (5th Cir. 1974); Life of the Land v. Brinegar, supra; National Resources Defense Council v. Morton, 458 F.2d 827 (D.C.Cir. 1972). A reasonably thorough discussion of the significant aspects of the probable environmental consequences is all that is required by an EIS.
 
 
 37
 Nonetheless, the appellant's contention that the EIS should have included a discussion of the environmental impact of the development of docks, second homes and corresponding structures and facilities as well as an analysis of the projected land-use pattern change that could result from the project gives us pause.[9] We agree that the statement could have been improved by a discussion of these issues. However, our review of the record convinces us that second home development and its consequences in connection with this project are only remote possibilities. In studying the area to be served with supplemental irrigation water from the project, the Bureau of Reclamation and the other agencies involved concluded that since the land immediately surrounding the reservoir and the land to be served by the project was a highly developed agricultural area with only a few small towns, no significant change could be expected either in population or land use patterns.[10] Moreover, the testimony offered at trial was not sufficient to rebut this conclusion. At best it merely showed that when second homes are planned around a reservoir, second homes are built. There was no such plan here nor has such a probability been demonstrated. It follows that the EIS is not deficient in its failure to discuss second home development. This failure does not impair its ability to serve the basic purposes it is required to serve.
 
 
 38
 Appellants also assert that the required detail of the EIS is lacking because neither does it fully discuss the supporting studies on which its conclusions are based nor are these studies attached to it. This assertion is without merit. The statement identifies and discusses the significant environmental impacts in sufficient detail, although its conclusory form requires that we caution those charged with the responsibility to prepare impact statements against too heavy reliance on such a form of presentation. It must be remembered that the public must be adequately informed of the probable significant environmental impacts by an impact statement. Finally, it is well settled that supporting studies need not be physically attached to the EIS. They only need be available and accessible. Life of the Land v. Brinegar, supra, 485 F.2d 468--469.
 
 
 39
 It is also asserted by the appellants that the EIS fails to discuss adequately measures which could have been taken to minimize harm to the environment as required by EDF v. Froehlke, 473 F.2d 346 (8th Cir. 1972); Sierra Club v. Froehlke, 359 F.Supp. 1289 at 1339--1341 (S.D.Texas, 1973); CEQ Guidelines § 11, 36 Fed.Reg. 7727. We disagree. While it is obvious that the mitigation measures could have been discussed in greater detail, it remains true that the EIS discussed these factors under eight headings, viz. Construction Specifications, Minimum Flows, Upstream Borrow, Transmission and Switchyard Facilities, Field Station and Operators' Residence, Roadway to Damsite, Fish and Wildlife, and Temperature Study Based on Reservoir Liminology. This discussion could have been more extensive, but we believe it was adequate. We are comforted in reaching this conclusion by the fact that subsequent to the filing of the Final EIS the Bureau of Reclamation prepared a fairly elaborate plan for mitigating fish and wildlife losses. The plan included numerous suggestions such as providing for spawning facilities and hatchery ponds, fish screens at new and existing canal headings, and the maintenance of a minimum flow at 300 cfs in the downstream waters. While this plan would not absolve a failure to prepare an adequate EIS, its existence does suggest that the EIS did inform the decision-makers adequately.
 
 The Second Phase
 
 40
 The Teton Dam and Reservoir Project is divided into two 'phases'. The so called First Phase, with which the EIS presently before us deals, comprises the actual construction of the dam and reservoir and disposition of 100,000 acre feet of active reservoir capacity for irrigation purposes.
 
 
 41
 The Second Phase of the project as authorized by Congress, calls for disposition of the remaining 100,000 acre feet of active reservoir capacity. This, however, can occur only after the Secretary of the Interior submits a finding of 'feasibility' to Congress and the President.[11]
 
 
 42
 The appellants contend that the EIS is fatally inadequate because it does not discuss the environmental impact of the Second Phase. They rely upon cases which hold that a series of interrelated steps constituting an integrated plan must be covered in a single impact statement.[12] We believe these authorities are inapposite and that the failure of the EIS to discuss the Second Phase does not render it inadequate. The distinction between those situations in which it has been held that the EIS must cover subsequent phases and that before us is that here the First Phase is substantially independent of the Second while in those in which the EIS must extend beyond the current project, that project was dependent on subsequent phases. The dependency is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken.[13] This is not the case here. Congress clearly intended that the First Phase of this project would be constructed without regard to whether the Secretary ever submits a finding of 'feasibility' with regard to the Second Phase.
 
 Alternatives
 
 43
 The appellants' assertion that the EIS does not adequately discuss alternatives is based, of course, on Section 102(2)(C) of NEPA which requires the EIS to present alternatives to the proposed action and Section 102(2)(D) which requires the agency to 'study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.' The purposes of these requirements are to assure that alternatives are explored in the initial decision-making process and to provide an opportunity to those removed from that process also to evaluate the alternatives. See Calvert Cliffs', supra.
 
 
 44
 The range of alternatives that must be considered need not extend beyond those reasonably related to the purposes of the project. See Life of the Land, supra. Also, EDF v. Corps of Engineers, 492 F.2d 1123, 1135 (5th Cir. 1974). The district court found that the primary purposes of the project are to control flooding in the Lower Teton Valley and to provide a source of irrigation water. It also established that the secondary purposes are to provide hydroelectric power and recreational benefits.
 
 
 45
 The EIS considered the alternatives of (1) no development whatsoever (the alternative of not accomplishing the project's purposes), (2) ground water pumping to obtain irrigation water, and (3) levees to control flooding in the Lower Teton Valley. The costs of doing nothing were considered excessive, ground water pumping would not produce enough water, and levees would not alleviate all ice jam type flooding. It also appears from the record of the proceedings below that other less reasonably related alternatives to the project's purposes were considered and rejected.
 
 
 46
 After considering these alternatives the EIS concluded that after fully assessing the environmental costs, the benefits to be derived from the accomplishment of the primary purposes of the project exceed such costs. It is our view that the range of alternatives considered by the EIS was adequate and that compliance with both Sections 102(2)(C) and 102(2)(D) of NEPA has been achieved.
 
 Cost-Benefit
 
 47
 Notwithstanding this evaluation of reasonably related alternatives and the conclusion of the EIS that the project's benefits exceed its costs, the appellants insist that the EIS is inadequate because it does not contain a formal and mathematically expressed cost-benefit analysis. We do not believe such an analysis is necessary to enable an EIS to serve the purposes for which it is designed.
 
 
 48
 This conclusion rests upon the hard fact that there is sufficient disagreement about how environmental amenities should be valued to permit any value so assigned to be challenged on the grounds of its subjectivity. It follows that in most, if not all, projects the ultimate decision to proceed with the projects, whether made by Congress or an agency, is not strictly a mathematical determination. Public affairs defy the control that precise quantification of its issues would impose.
 
 
 49
 This is not to say that progress is not being made in devising techniques which will make cost-benefit analyses more reliable. Nor is it to say that under no circumstances should the EIS contain a numerically expressed cost-benefit analysis. We intend merely to say that under the circumstances of this case the absence of such an analysis in the EIS is not fatal. The EIS before us is sufficiently detailed to aid the decision-makers in deciding whether to proceed or not and to provide the information the public needs to enable both those who would challenge, and those who would support, the project to respond effectively. No controlling authority brought to our attention forecloses this determination.[14] We would be less confident that these purposes have been achieved were it not clear from the record of this case that this project has undergone a cost-benefit analysis because of its status as a reclamation project.[15] As it is, we consider the EIS adequate.
 
 
 50
 Affirmed.
 
 
 
 *
 Honorable William P. Gray, United States District Judge, Central District of California, Sitting by designation
 
 
 [1]
 Trout Unlimited; Treasure Valley Chapter of Trout Unlimited; Sierra Club; Natural Resources Defense Council; and Idaho Environmental Council
 
 
 [2]
 The 'Second Phase' provides for the disposition of the second 100,000 acre feet of the total 200,000 active feet; the purpose is mainly to provide irrigation for 37,000 acres of land. The 'Second Phase' will not begin until the Secretary of the Interior conducts a 'feasibility study' as to its development and prepares an environmental impact statement on the proposed action
 
 
 [3]
 Congress has appropriated funds for this project for every year since 1967. These appropriations through Fiscal Year 1974, total $36,470,917. For Fiscal Year 1975, the President's budget contains $11,675,000 for continued construction of the project and related facilities
 
 
 [4]
 The record indicates that the following studies were a available and utilized:
 (a) A study of 1959 conducted by the Bureau of Sport Fisheries and Wildlife. This study appeared as a part of House Document 208, printed January 29, 1964.
 (b) An archaelogical exploration of the Teton Reservoir site was made in 1967 by Idaho State University for the National Park Service.
 (c) An investigation conducted by the United States Bureau of Mines.
 (d) An extensive study of the probable effect of the project on the quality of the water, both in the reservoir and down stream in the river, completed by water quality experts of the United States Bureau of Reclamation.
 (e) Extensive foundation studies of the damsite and reservoir area have been conducted by geologists of the United States Bureau of Reclamation.
 (f) Studies conducted by the National Park Service and Idaho Department of Parks.
 (g) Since the early 1950's and even before, the Corps of Engineers of the United States Army, as well as the United States Bureau of Reclamation, had made studies of the magnitude and extent of flooding from the Teton River.
 (h) Ground water hydrology studies and tests performed over a period of many years by the United States Geological Survey and Bureau of Reclamation.
 
 
 [5]
 See Council on Environmental Quality, Guidelines for Implementation of National Environmental Policy Act, 36 Fed.Reg. 7724 (April 23, 1971), modified subsequently in 40 C.F.R. Sec. 1500.13, 38 Fed.Reg. 20550 (August 1, 1974)
 
 
 [6]
 Some objections to the project were also filed. The record discloses that the Environmental Protection Agency (EPA) submitted a memorandum containing its objections to the
 
 
 [7]
 Executive Order No. 11514 (March 5, 1970), 1970 U.S.Code Cong. and Admin. News, p. 6228, the 'Guidelines' of the President's Council on Environmental Quality (CEQ), 36 Fed.Reg. 7724 (April 23, 1971) superseded by 'Guidelines' 40 C.F.R. Sec. 1500.13, 38 Fed.Feg. 20550 (August 1, 1973), and the Manual of the Department of the Interior, Part 516, Chapter 2, implement of the provisions of NEPA and place mandatory duties upon the Bureau of Reclamation regarding preparation of environmental impact statements and compliance with the procedures of NEPA
 
 
 [8]
 Section 102 grants public access to an EIS pursuant to 5 U.S.C.A. § 552
 
 
 [9]
 Appellants argue that an EIS must include a discussion of the secondary impacts as a substantive requirement. See CEQ Guidelines, 36 Fed.Reg. 7725 (April 23, 1971). While agreeing that under a given factual situation failure to include a discussion of secondary impacts might render an EIS fatally defective, we can not say that a specific treatment of secondary impacts is a substantive requirement of the impact statement. The central focus should not be on a primary/secondary impact analysis but upon those impacts (either primary or secondary) which have a 'significant impact' upon the environment
 
 
 [10]
 See Finding of Fact XII, paragraph 7 of the trial court based upon an independent study conducted by the Federal Bureau of Land Management
 
 
 [11]
 43 U.S.C.A. § 616qq(c). The Second Phase of the project would require three steps before it could get underway. No actual construction of the Second Phase can begin until (a) the Secretary of Interior makes a determination that the Second Phase is feasible, (b) an EIS is prepared and submitted to Congress simultaneously with the feasibility report and (c) the Congress then decides to appropriate funds
 
 
 [12]
 Appellants cite Jones v. D.C. Redevelopment Land Agency, 163 U.S.App.D.C. 366, 499 F.2d 502 (1974) for support of their argument that the project's 'Second Phase' should have been included in the impact statement. In that case the court required the Redevelopment Land Agency to prepare an EIS prior to its submission of an urban renewal plan to the National Capital Planning Commission for approval, even though the commission could have modified the plan and itself prepare an impact statement and even though the Department of Housing and Urban Development was also required to prepare an EIS. The court specifically required the preparation of the EIS because they found that the RLA submission constituted a distinct stage in the plan approval process and was itself a major federal action significantly affecting the environment. No such analogy exists in the present circumstances. The district court found that the 'Second Phase' would require an EIS before construction and therefore such an impact statement would be prepared at the 'earliest possible time.'
 
 
 [13]
 Appellants rely on a number of cases to demonstrate that a series of steps constituting an integrated plan must be covered in a single impact statement. These cases have little application to the present state of facts. The decisions which hold that agencies may not submit separate statements for planned interconnecting highway segments stress that each segment has little independent significance in itself and that the first-constructed segment necessarily predetermines the location of succeeding segments. See Thompson v. Fugate, 347 F.Supp. 120 (D.Conn.1972); Indian Lookout Alliance v. Volpe, 345 F.Supp. 1167 (S.D.Iowa 1972), mod. 484 F.2d 11 (8th Cir. 1973)
 Nor is Scientists' Institute for Public Information v. Atomic Energy Comm'n, 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973) particularly pertinent here. There an EIS was required for continued research and development on the AEC's Liquified Metal Fast Breeder Reactor (LMFBR) Program covering foreseeable environmental effects if such a reactor were put into future use. The LMFBR has no independent significance absent such future uses. The court was careful to emphasize that its decision to require an EIS was based in large part upon the significance of the overall reactor program as a radical change in the manner in which the entire nation produces electricity. See 481 F.2d at 1089. Unlike Scientists' Institute, supra, the immediate benefits of flood control, irrigation and hydroelectric power, (all covered by the EIS) will result from the First Phase. The question of when or if the Second Phase would ever be implemented did not play a significant part in the decision to go forward with the project and can therefore be appropriately delayed until such time as the Secretary of Interior makes the requisite finding of feasibility.
 
 
 [14]
 Appellants rely primarily upon Calvert Cliffs', supra, to support their contention that the impact statement must include a cost-benefit analysis. See also, Natural Resources Defense Council v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972); Cape Henry Bird Club v. Laird, 359 F.Supp. 404 (W.D.Va.1973), aff'd 484 F.2d 453 (4th Cir. 1973). However, compare; EDF v. Armstrong, 352 F.Supp. 50, 57 (N.D.Cal.1972), aff'd 487 F.2d 814 (9th Cir. 1973). However, such reliance is misplaced. First, there are no specific statutory requirements which would mandate the inclusion of a cost-benefit formula in the impact statement. Moreover, there is nothing in these opinions which suggests that a formal equation need be included as an independent requirement of NEPA nor considered under any stricter standard than any other of the determinants involved in the substantive decision to proceed with a particular project
 
 
 [15]
 See 33 U.S.C.A. § 701 et seq.; Such an analysis was provided to the House of Representatives, see House Document 208, 88th Congress, 2d Sess., pp. XIII to XIX (1964)