206 F.3d 920 (9th Cir. 2000)
 ARTHUR S. WEST, an individual, Plaintiff-Appellant,
v.
SECRETARY OF THE DEPARTMENT OF TRANSPORTATION; FEDERAL HIGHWAY ADMINISTRATION; SID MORRISON; WASHINGTON STATE DEPARTMENT OF TRANSPORTATION ; AND WEYERHAEUSER REAL ESTATE COMPANY,Defendants-Appellees.
 No. 97-36118
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted March 11, 1999
Filed March 20, 2000
 
 [Copyrighted Material Omitted]
 COUNSEL: Arthur West, Olympia, Washington, for the plaintiff appellant.
 Brian C. Kipnis, John A. Bryson, Tamara N. Rountree, United States Department of Justice, Washington, D.C., for federal defendants-appellees Department of Transportation and Federal Highway Administration; Deborah Cade, Assistant Attorney General, Olympia, Washington, for state defendantappellee Washington State Department of Transportation; George A. Kresovich, Brian D. Todd, Hillis Clark Martin & Peterson, Seattle, Washington, for defendant-appellee Weyerhaeuser Company.
 Appeal from the United States District Courtfor the Western District of Washington; Robert J. Bryan, District Judge, Presiding. D.C. No. CV-96-05453-RJB
 Before: Betty B. Fletcher, Stephen Reinhardt, and Sidney R. Thomas, Circuit Judges.
 Opinion by Judge B. Fletcher; Dissent by Judge Thomas
 B. FLETCHER, Circuit Judge:
 
 
 1
 Arthur S. West appeals pro se the district court's dismissal of his claims challenging the Federal Highway Administration's ("FHWA") decision to categorically exclude a twostage highway interchange project from review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. S 4332. The district court determined that the FHWA's decision to proceed using a documented categorical exclusion was not arbitrary and capricious. We have jurisdiction pursuant to 28 U.S.C. S 1291. We reverse and remand.
 
 I. BACKGROUND
 
 2
 In 1985, the city of DuPont identified the need for a new highway interchange in its Comprehensive Plan, in part to accommodate the traffic demands generated by existing growth and sizeable growth forecast for the area. Intel, a large computer chip maker planned to open a DuPont campus, and Weyerhaeuser proposed to build a 3,200-acre master planned unit development called Northwest Landing consisting of residential, commercial, and light industrial uses. In a 1995 Final Supplemental Environmental Impact Statement for its Comprehensive Plan, DuPont considered the environmental impacts of this increased growth pursuant to Washington's Growth Management Act, RCW ch. 36.70A.
 
 
 3
 To accommodate this increased traffic, the Washington State Department of Transportation ("WSDOT") prepared a Freeway Access Report in October 1995 describing a new highway interchange -the "South DuPont interchange" -at milepost 118 on Interstate 5 ("I-5") between Seattle and Tacoma. In December 1995, the FHWA, which must approve the construction of new access points on the interstate highway system, granted preliminary approval for the new interchange, subject to the state's compliance with applicable federal requirements including the FHWA's environmental review of the effects of the proposed project. See 23 U.S.C. S 111(a).
 
 
 4
 The WSDOT proposed a two-stage "fully directional interchange" construction project. Stage 1 involved construction of a new interchange at milepost 118 to allow access from I-5 to the main road serving Weyerhaeuser's Northwest Landing Development in DuPont.[1] Stage 2, unfunded and not concretely defined, is generally described as the "ultimate interchange" that would upgrade the new Stage 1 interchange, reroute additional connectors and reconstruct an existing interchange adjacent to the new South DuPont interchange, and provide a new gated access to Fort Lewis.
 
 
 5
 The Final Project Summary prepared by WSDOT for FHWA approval describes an $18.6 million project in which:
 
 
 6
 Stage 1 construction will include a 4 lane structure over SR5, a northbound on and off ramp, a south bound on and off ramp, plus modification to the Mounts Road Weigh Station ramp. Auxiliary lanes will be constructed between the South DuPont I/C and the existing DuPont I/C northbound and south bound, and between South DuPont I/C and Mounts Rd. I/C southbound.
 
 
 7
 The Environmental Document prepared for the project by WSDOT explains that:
 
 
 8
 The major structure (Center Drive overcrossing) will be a bridge crossing over I-5 and the Burlington Northern-Santa Fe Railroad tracks. Two ramp struc tures will provide on and off movements for south bound traffic. A truck ramp will move trucks leaving the existing truck weigh station around the new interchange . . . . Under Stage 1 a loop ramp, and partial utilization of the truck weigh station ramp, will provide on and off movement for northbound traffic. An existing I-5 structure (Fort Lewis laundry railroad spur overcrossing) will require widening. A small structure will provide access over the truck ramp to Center Drive. In Stage 1 this access will be limited to emergency vehicles. In the ultimate con figuration this structure will be widened for two-way traffic and full access to the interchange. Stage 1 auxiliary lanes will be constructed in the southbound and northbound directions . . . .
 
 
 9
 WSDOT prepared several environmental reports to assess the environmental impacts of the proposed project, including a report on the Fort Lewis landfill,[2] an airquality report, a cultural resource survey, and a biological assessment for bald eagles and marbled murrelets. No study suggested any significant environmental impact from the proposed project.
 
 
 10
 West and others raised concerns about the project in a public design hearing in February 1996. In April 1996, the FHWA, the Department of Transportation, and WSDOT released a joint environmental document for the "Interstate 5 South DuPont Interchange." The agencies concluded that the project would not cause significant environmental impacts and satisfied the criteria for a "documented categorical exclusion" under NEPA, and a Determination of Nonsignificance under Washington's State Environmental Policy Act ("SEPA"), RCW 43.21C. These determinations enabled highway construction to begin without further environmental review.
 
 
 11
 West filed a complaint in district court seeking, in part, a declaration that the interchange is not categorically excluded from NEPA and an injunction requiring work to cease on the project until the agencies prepared an Environmental Impact Statement. The court denied West's request for a preliminary injunction and in an oral decision, dismissed all of West's claims.[3] West timely appealed.
 
 II. ANALYSIS
 
 12
 We review de novo a district court's order granting summary judgment. Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir. 1998). We must determine whether the FHWA's decision to approve a documented categorical exclusion satisfied NEPA requirements for a categorical exclusion or whether this action was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." Administrative Procedure Act, 5 U.S.C. S 706(2)(A). The arbitrary and capricious standard "applies to an agency's determination that a particular action falls within one of its categorical exclusions." Bicycle Trails Council of Marin v. Babbitt, 82 F.3d 1445, 1456 (9th Cir. 1996) ("An agency satisfies NEPA if it applies its categorical exclusions and determines that neither an EA nor an EIS is required, so long as the application of the exclusions to the facts of the particular action is not arbitrary and capricious."). Under that standard, we will disapprove of an agency's decision if it made "a clear error of judgment." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989).
 
 A. Mootness
 
 13
 Weyerhaeuser contends that we should dismiss this appeal as moot because construction for Stage 1 of the interchange has been completed. A case becomes moot whenever it "los[es] its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law." Hall v. Beals , 396 U.S. 45, 48 (1969). According to the classic formulation, in order to be justiciable, a "controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy, admitting of a specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 240-41 (1937) (citations omitted). As the Ninth Circuit has held, however," [t]he burden of demonstrating mootness is a heavy one." Northwest Envt'l Def. Ctr. v. Gordon, 849 F.2d 1241, 1244 (9th Cir. 1988) (citing County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979); Arnold v. United States, 816 F.2d 1306, 1309 (9th Cir. 1987)).
 
 
 14
 In Columbia Basin Land Protection Ass'n v. Schlesinger, 643 F.2d 585 (9th Cir. 1981), we addressed mootness in the context of NEPA. Plaintiffs in Columbia Basin challenged the adequacy of an EIS prepared to review the environmental effects of a proposed power line running across their farmland. Plaintiffs sought to enjoin construction of the power line. Over two years before the case came up on appeal, however, all 191 towers required for the line were erected and the line was placed in operation. Against the claim that construction and operation of the power lines rendered the appeal moot, we said
 
 
 15
 were this Court to find the EIS inadequate, or the decision to build along Route D-1 arbitrary and capricious, the agency would have to correct the decision-making process, and ultimately could be required to remove the line from this route. Clearly, therefore, this case presents a live controversy with concrete facts, and parties with adverse interests.
 
 
 16
 643 F.2d at 591 n.1. Most importantly (for purposes of justiciability in NEPA cases), we emphasized:
 
 
 17
 If the fact that the towers are built and operating were enough to make the case nonjusticiable, as the dissent states, then the BPA (and all similar entities) could merely ignore the requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine. Such a result is not acceptable.
 
 
 18
 Id. (emphasis added). Indeed, we held the case to be justiciable despite the fact that, upon review of the merits, we found no NEPA violation and thus ordered no remedy.
 
 
 19
 Here, although Stage 1 of the interchange project is complete, and the new interchange is carrying traffic, West's action is not moot. Stage 2 has not yet begun and, upon finding that defendants failed to comply with NEPA, our remedial powers would include remanding for additional environmental review and, conceivably, ordering the interchange closed or taken down. Thus, as in Columbia Basin, the controversy is live and the alleged injuries admit of specific relief. See Gordon, 849 F.2d at 1244-45 ("in deciding a mootness issue, `the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be any effective relief' "; regulations governing 1986 salmon season not mooted by close of season where damage could be repaired/ mitigated "obviously not by restoring the fish harvested in 1986, but by allowing more fish to spawn in 1989") (emphasis added in Gordon) (quoting Garcia v. Lawn, 805 F.2d 1400, 1403 (9th Cir. 1986)).[4] The fact that Stage 1 of theinterchange has been constructed and is operational is insufficient to render the case moot.[5]
 
 
 20
 B. NEPA and the Use of Categorical Exclusions
 
 
 21
 NEPA requires an agency to consider the environmental impacts of any "major federal action significantly affecting the quality of the human environment." 42 U.S.C. S 4332(2)(C). NEPA compliance is triggered in this case because the Federal Highway Administration, a federal agency, must approve any new points of access to or exits from the interstate highway system. See 23 U.S.C. S 111(a) ("the State will not add any points of access to, or exit from, [the interstate highway system] without the prior approval of the [FHWA]"); see also 23 C.F.R.S 771.107 (defining "action" and "administration action"), and 23 C.F.R. S 771.113 (project construction shall not proceed until the action has been classified as a categorical exclusion or the agency makes a finding of no significant impact or issues a final EIS).[6] We must determine whether a categorical exclusion provides the appropriate level of environmental review for a new highway interchange construction project. The issue appears to be one of first impression.
 
 
 22
 West contends that the FHWA should have prepared an Environmental Impact Statement ("EIS") or an Environmental Assessment ("EA") instead of proceeding with the interchange project under a categorical exclusion. An EIS is a "detailed written statement concerning the environmental impacts of the proposed action and any adverse environmental effects which cannot be avoided." 42 U.S.C. S 4332(2)(C). An environmental assessment is
 
 
 23
 a concise public document . . . that serves to [b]riefly provide sufficient evidence and analysis for deter mining whether to prepare an environmental impact statement or a finding of no significant impact. [EA's must] include brief discussions of the need for the proposal, of alternatives . . . of the environmental impacts of the proposed actionand alternatives, and a listing of agencies and persons consulted.
 
 
 24
 40 C.F.R. S 1508.9. Although NEPA requires federal agencies to prepare a detailed EIS for "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. S 4332(2)(C), under federal regulations promulgated by the Council on Environmental Quality, the responsible agency may instead first prepare an Environmental Assessment to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact. " 40 C.F.R.S 1508.9(a)(1) (1997). See City of Auburn v. United States, 154 F.3d 1025, 1031 (9th Cir. 1998). Then, if the agency determines, based on factors specified in 40 C.F.R. S 1508.27(b), that "substantial questions are raised as to whether [the] project may cause significant degradation of some human environmental factor," it must prepare an EIS. Blue Mountains Biodiversity Project, 161 F.3d at 1212. If, however, the Environmental Assessment reveals that the project will not have a significant effect on any aspect of the environment, the agency issues a "finding of no significant impact," 40 C.F.R. S 1508.13, and no EIS is required. See generally Blue Mountains Biodiversity Project, 161 F.3d at 1211-14."
 
 
 25
 In some cases, however, neither an EA nor an EIS is required. See 23 C.F.R. S 771.115. The Council of Environmental Quality ("CEQ") NEPA regulations authorize an agency to use a "categorical exclusion" for a "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations." 40 C.F.R. S 1508.4; see also 40 C.F.R.S 1500.4(p). Neither an EIS nor an EA is required for actions categorically excluded from NEPA review. See, e.g., 40 C.F.R. S 1507.3(b)(2)(ii); 23 C.F.R. S 711.117.
 
 
 26
 Pursuant to CEQ regulations, each agency develops criteria to determine the appropriate level of environmental review for different types of actions. See 40 C.F.R. S 1507.3(b)(2); see also 23 C.F.R.S 771.115 (FHWA regulation describing three classes of reviews -an EIS, EA, or CE -each requiring different levels of NEPA documentation). Under the FHWA's NEPA regulations, a categorical exclusion may be used for actions that "do not involve significant environmental impacts" and
 
 
 27
 do not induce significant impacts to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a sig nificant impact on any natural, cultural, recreational, historic or other resource; do not involve significant air, noise, or water quality impacts; do not have sig nificant impacts on travel patterns; or do not other wise, either individually or cumulatively, have any significant environmental impacts.
 
 
 28
 See 23 C.F.R. S 771.117(a).
 
 
 29
 The FHWA regulations specify two types of categorical exclusions. See 23 C.F.R. S 711.115(b). First, the regulations list twenty actions that meet the criteria for a categorical exclusion and generally do not require further NEPA documentation. See 23 C.F.R. S 771.117(c). The parties agree that the DuPont interchange project does not fit in that list. It is the second type of categorical exclusion -a "documented categorical exclusion" ("DCE") -that defendants insist is applicable here.
 
 
 30
 A DCE is available for certain types of actions that comply with the overarching definition of a categorical exclusion in 40 C.F.R. S 1508.4 and 23 C.F.R. S 771.117(a), quoted above, and where the applicant submits documentation demonstrating compliance with the categorical exclusion criteria. See 23 C.F.R. S 771.117(d). Section 771.117(d) providesa non-exclusive list of examples for which a DCE may be appropriate. The FHWA used a DCE for the DuPont interchange project. We have recently held that "an agency's interpretation of the meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation. " See Alaska Center, 189 F.3d at 857.
 
 
 31
 Defendants urge that the project fits most appropriately under the DCE example, "Approvals for changes in access control," 23 C.F.R. S 771(d)(7), because the FHWA was required to approve the new interchange in advance of construction. "Approvals for changes in access control," however, is not defined in the regulations, the legislative history, or case law.[7] For guidance, we look to the non-exclusive list of actions identified in the regulations for DCEs, as well as the itemized list of categorically excluded actions. See 23 C.F.R. S 771.117(c). The types of projects described in those places suggest strongly that a DCE is not appropriate for a highway interchange construction project. None of the examples listed in the DCE regulations approaches the magnitude of this project an entirely new, $18.6 million, four-lane, "fully-directional" interchange constructed over a former Superfund site and requiring 500,000 cubic yards of fill material, 30,000 tons of crushed surfacing, and 32,000 tons of asphalt concrete pavement. To the contrary, the other examples provided in 23 C.F.R. S 771.117(d) suggest that the FHWA intends a very different scale of project to escape the more detailed environmental review that would occur in an environmental assessment. For example, projects for which a DCE is potentially available include "modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes,"[8] "highway safety or traffic operations improvements projects including the installation of ramp metering control devices and lighting," "bridge rehabilitation, reconstruction or replacement or the construction of grade separation to replace existing at-grade railroad crossings," and other similar activities. See 23 C.F.R. S 771.117(d). We conclude, therefore, that "approvals for changes in access control"[9] listed in 23 C.F.R. S 771.117(d)(7) does not embrace this project. The statutory requirement in 23 C.F.R. S 771.117(d), that the FHWA approve a state's plans to add access and exit points to an interstate highway, is not synonymous with the "approval for changes in access control" in 23 C.F.R. S 771.117(d) for which a documented categorical exclusion may be used.
 
 
 32
 Our conclusion that a DCE is inappropriate for this project is bolstered by the FHWA's own limitations on the use of a categorical exclusion. A DCE may be used only for additional actions, not listed in 23 C.F.R. S 771.117(c), that "meet the criteria for a [categorical exclusion] in the CEQ regulations (40 CFR 1508.4) and [23 C.F.R. S 771.117(a)]." 23 C.F.R. S 771.117(d). The FHWA regulations forbid the use of a categorical exclusion for projects that will have "significant impacts on travel patterns." 23 C.F.R. S 771.117(a). The new South DuPont interchange was designed with the intent that it have significant impacts on travel patterns. It was designed and constructed because the agencies predicted that the existing interchanges were inadequate to handle the traffic from the anticipated growth. It is axiomatic that a new, fullydirectional interchange cannot simultaneously relieve traffic congestion and yet have no significant impact on travel patterns.[10] The interchange construction project, therefore, fails the first prong of the test for a DCE -satisfying the general CE criteria -and is inconsistent with the terms used in the regulation. See Alaska Center for the Environment, 189 F.3d at 857.
 
 
 33
 The district court failed to consider the procedural requirements for using a categorical exclusion and looked only to the agencies' conclusion that the project would not result in any significant environmental impact. The issue, however, is not just whether the interchange will cause a significant environmental impact, but whether the path taken to reach that conclusion was the right one in light of NEPA's procedural requirements. See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 340 (1989) ("NEPA itself does not mandate particular results, but simply prescribes the necessary process."). By proceeding under a DCE, the FHWA selected the wrong path. We conclude that an environmental assessment was required and the review process should have been different. See 23 C.F.R. S 771.119.
 
 C. Remedy
 
 34
 The conclusion that the FHWA erred in using a documented categorical exclusion, leaves the difficult question of what is the appropriate remedy. The interchange is open to traffic, and was opened at the time the district court dismissed West's claims. Although the FHWA conducted some environmental review of the project, it failed to comply with NEPA's review requirements. While we recognize that it may be too late to correct problems that the requisite environmental review might have identified, we are not convinced that all the problems identified by such a review would be immune from all mitigation measures. There may be ways to modify the operation of the interchange or to mitigate its effects by altering plans for stage 2 or by other transportation planning measures for the existing structure. Thus, there are likely other available remedial measures short of tearing the interchange down. While the latter, drastic, remedy would not appear to have beneficial environmental effects, that fact does not render thorough environmental review pointless.
 
 
 35
 Stage 2 presents less complex remedial issues. Although the DCE purportedly applies to Stages 1 and 2, and the district court appeared to approve the FHWA's use of a DCE for the entire project, we conclude that Stages 1 and 2 are independent projects and merit independent environmental review. They are on separate tracks for completion. Stage 1, according to the DCE, "has independent utility; i.e., Stage 1 will be a fully functional facility and is not dependent upon construction of Stage 2." Stage 2, though mentionedin the DCE, appears to be in the preliminary planning stages. It is only vaguely defined, without a precise scope or timetable for completion. WSDOT has no firm plans or funding to build Stage 2. Even the DCE admits candidly that Stage 2"is not funded nor scheduled for construction at this time."[11] At argument, WSDOT conceded that if enough time passes, the existing environmental documentation is likely to become stale.[12]
 
 
 36
 We have found no support for an agency categorically to exclude a project with undefined parameters and an uncertain timetable for start or completion. The FHWA's decision to issue a single environmental document for Stage 1 together with Stage 2, when it was unable to define the parameters of Stage 2, was error.[13] Because we hold that a DCE may not be used for a highway interchange construction project, and because Stage 2 is insufficiently defined at this point, the existing DCE may not be used to satisfy the FHWA's NEPA obligations. The type of environmental review that will ultimately be required for Stage 2 will depend on the scope of Stage 2 when it takes shape more clearly.[14]
 
 III. CONCLUSION
 
 37
 We reverse the district court's decision approving the FHWA's use of a DCE for the South DuPont interchange construction project. While we decline to order the interchange torn down, we direct the district court to order the requisite environmental review for Stage 1. We vacate the district court decision as it relates to Stage 2.
 
 
 38
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Weyerhaeuser funded the interchange as mitigation for its Northwest Landing development.
 
 
 [2]
 The new interchange would be built over a portion of the closed landfill. The landfill had been a Superfund site, but was removed from the Superfund list after development of a reclamation plan. WSDOT committed to clean up the affected portion of the landfill concurrently with the construction of the interchange.
 
 
 [3]
 The interchange, as described in Stage 1, was completed and opened to traffic in October 1997.
 
 
 [4]
 According to Wright & Miller:"The central question of all mootness problems is whether changes in the circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief . . . . [C]ourts must be careful to appraise the full range of remedial opportunities." 13A FEDERAL PRACTICE AND PROCEDURE S 3533.3 at 268 (1984). See Airport Neighbors Alliance Inc. v. United States, 90 F.3d 426, 428-29 (10th Cir. 1996) (NEPA challenge to already constructed runway not moot because court "could order that the runway be closed or impose restrictions on its use until Respondents complied with NEPA"); Pyramid Lake Paiute Tribe v. Hodel, 882 F.2d 364, 368-69 (9th Cir. 1989) (challenge to water diversion not mooted after diversion took place where impacts on fishery could be remedied by storing more water in reservoir for use in future spawning seasons); Kirby v. U.S. Dept. of Housing & Urban Dev., 745 F.2d 204, 207 (3d Cir. 1984) (challenge to construction of public housing project not mooted by construction of project where part of relief sought still available; "Although emphasis on the efficacy of the remedy is appropriate, changed circumstances will frequently moot only some forms of relief, leaving other useful forms available.") (citing Columbia Basin); Montana v. Johnson, 738 F.2d 1074, 1077 (9th Cir. 1984) (action not moot where challenged power lines could be removed) (citing Columbia Basin); Wright & Miller, 13A FEDERAL PRACTICE AND PROCEDURE S 3533.3 at 278 ("However the cases are grouped, the central responsibility remains unchanged -decision should not be denied if a worthwhile remedy can be given.").
 
 
 [5]
 The dissent relies on Sierra Club v. Penfold, 857 F.2d 1307, 1318 (9th Cir. 1988) (holding moot a NEPA challenge to completed mining operations). Although the Penfold court recognized that Columbia Basin represents the circuit's "preeminent law with respect to mootness in a NEPA claim," id., the case distinguished Columbia Basin on its facts. In Penfold, the plaintiffs entered into a stipulation with the Bureau of Land management regarding its NEPA obligations in reviewing and approving operations at a set of mines for a single season. When just a few weeks remained in the mining season plaintiffs moved the district court to order compliance with the stipulation. The court reasoned that "[t]his rendered the motion moot at nearly the same time it became ripe for decision." Id. at 1317. First, the court held that "[u]nlike a power transmission line, a completed mining operation cannot be moved" and the impacts of the mining operation could not be reversed. Id. Second, the court held that even if reclamation efforts would have been effective in mitigating the harm caused by mining, the court was powerless to order reclamation because this form of relief was not included in the miners' plans as approved according to the stipulation. Id.
 Here, however cumbersome or costly it might be, the interchange could be removed or closed. And perhaps more importantly, reasonable mitigation efforts short of removal (such as use restrictions or structural changes) are well within the range of available remedies. In short, our remedial powers are not restricted, as in Penfold, by any antecedent agreement between the parties, and all the concerns that animated the Columbia Basin decision are present.
 
 
 [6]
 Defendants have raised a new argument that there is no "major federal action" triggering NEPA. Even if we were to entertain that argument, it lacks merit as the FHWA regulations explain that the NEPA regulations
 
 
 [7]
 We have found only one case that referenced "changes in access control," albeit in a version of the FHWA's NEPA regulations that predated the ones at issue here. See City of Alexandria, Virginia v. Fed. Highway Admin., 756 F.2d 1014, 1019 (4th Cir. 1985). In that case, the court noted that the FHWA's general definitions adopt the industry definition promulgated by the American Association of State Highway and Transportation Officials, and that "access control" is defined in adopted documents as "[t]he condition where the right of owners or occupants of abutting land or other persons to access, light, air or view in connection with a highway is fully or partially controlled by public authority." Id. at n.4.
 
 
 [8]
 Another case, interpreting the earlier version of the FHWA categorical exclusion regulations concluded that a modernization and re-paving project qualified for a categorical exclusion because the project, on the record before the court, was not going to turn the road in question into a major highway, and the changes to the highway were comparatively minor. See No East-West Highway Committee v. Chandler, 767 F.2d 21, 26 (1st Cir. 1985).
 
 
 [9]
 Moreover, when "access control" is used elsewhere in FHWA regulations, it appears to relate generally to right-of-way related issues. See, e.g., 23 C.F.R. S 620.203(d),(f)(procedures for relinquishing facilities); 23 C.F.R. S 635.505(a)(10) (maintenance guidelines); 645.209(c) (utility installations within freeways); 23 C.F.R. S 713.103(h) (policies and procedures for lands acquired for rights-of-way purposes).
 
 
 [10]
 West suggests that Price Road Neighborhood Ass'n v. Dept. of Transp., 113 F.3d 1505 (9th Cir. 1997) and City of Davis v. Colman, 521 F.2d 661 (9th Cir. 1975) establish a per se rule that all highway interchanges require an EA. We need not decide if those cases create such a broad rule. Here, we hold only that an interchange designed to have a substantial effect on traffic patterns does not qualify for a documented categorical exclusion.
 
 
 [11]
 For example, the air quality study notes that plans for the new Fort Lewis gate, upon which portions of Stage 2 hinge,"are conceptual at this time and not anticipated in the near future."
 
 
 [12]
 We also question whether all of the supporting environmental documentation for the DCE even considered the full scope of Stage 2 impacts. For example, the air quality study explains that "Stage 2 existing DuPont Interchange modifications . . . were not modeled in this report."
 
 
 [13]
 Although there is authority for the proposition that "a series of interrelated steps constituting an integrated plan must be covered in a single impact statement," Trout Unlimited v. Morton , 509 F.2d 1276, 1285 (9th Cir. 1974) (citing and distinguishing authority for combined environmental review), this is not such a case. See also The Steamboaters v. FERC,759 F.2d 1382 (9th Cir. 1985) (following Trout Unlimited). Stages 1 and 2 lack the kind of interdependence which would require treatment in a single environmental review. See Trout Unlimited, 509 F.2d at 1285 (combined EIS required where "it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken"). Indeed, as we have indicated above, Stage 2 is sufficiently undefined that combining it with the environmental review for Stage 1 violates NEPA.
 
 
 [14]
 The dissent claims that our review of the DCE's application to Stage 2 is premature. Ripeness requires an evaluation of "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 18 L. Ed. 2d 681, 87 S. Ct. 1507 (1967) (courts should withhold review until "an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties"), overruled on other grounds, Califano v. Sanders, 430 U.S. 99, 105, 51 L. Ed. 2d 192, 97 S. Ct. 980 (1977). Here, we confront final agency action applying a DCE to the entire interchange project and a district court decision holding that the DCE was properly applied. Thus, as far as NEPA is concerned, defendants have a green light to proceed with Stage 2 even though the contours of Stage 2 construction have not yet been defined. Although the dissent takes this uncertainty as a sign that litigation over Stage 2 is unripe, our holding is simply that, whatever the ultimate contours of Stage 2 construction, NEPA's requirements cannot be met by applying a categorical exclusion to an as yet undefined project. Plaintiff need not wait until construction begins on Stage 2 to challenge this aspect of the agencies' decisionmaking. The issue is fit for review and resolution along with Stage 1 imposes no hardship on defendants.
 The dissent contends that Ohio Forestry Ass'n Inc. v. Sierra Club, 523 U.S. 726, 140 L. Ed. 2d 921, 118 S. Ct. 1665 (1998), requires a different conclusion because the application of the DCE to Stage 2 presents no danger of imminent and certain injury to Mr. West. Ohio Forestry, however, involved a primarily substantive challenge to a forest plan which the Court explicitly distinguished from a challenge to agency action for failure to comply with NEPA:
 Congress has not provided for pre-implementation judicial review of forest plans . . . . Nor does the Plan, which through standards guides future use of forests, resemble an environmental impact statement prepared pursuant to NEPA. That is because in this respect NEPA, unlike the [National Forest Management Act], simply guarantees a particular procedure, not a particular result. Hence a person with standing who is injured by a failure to comply with NEPA procedure may complain of that failure at the same time the failure takes place, for the claim can never get riper.
 523 U.S. at 737 (citations omitted). The dissent's focus on harm to Mr. West also seems misplaced. West has surely been harmed by the application of a DCE since it precluded the kind of public comment and participation NEPA requires in the EIS process. But the core harm NEPA protects against is harm to the environment. See Sierra Club v. Marsh, 872 F.2d 497, 500 (1st Cir. 1989) ("the harm consists of added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with public comment) of the likely effects of their decision upon the environment. NEPA's object is to minimize that risk, the risk of uninformed choice . . . .").
 
 
 THOMAS, Circuit Judge, dissenting:
 
 39
 A case is moot where the issues before the court no longer present a live controversy or the parties lack a cognizable interest in the outcome of the suit. See Murphy v. Hunt, 455 U.S. 478, 481, 71 L. Ed. 2d 353, 102 S. Ct. 1181 (1982). There is nothing live about the controversy concerning the South DuPont interchange. Construction has ended. Thousands of automobiles traverse the interchange daily, as they have since it opened for traffic in October, 1997. The environmental damage of which Mr. West complains has been accomplished; it cannot be remedied by destruction and removal of the interchange, or additional environmental review. No order of this Court can alchemize concrete and asphalt into blueprint. See Sierra Club v. Penfold, 857 F.2d 1307, 1318 (9th Cir. 1988) (holding that a completed mining operation cannot be "unmined"). Although the majority notes that there may exist other possibilities for damage mitigation, these ruminations are outside the relief Mr. West sought. He did not seek remediation; he wanted the interchange stopped. It was built. Therefore, there is no justiciable controversy pertaining to Phase I.
 
 
 40
 Although daily commuters have long since made the interchange construction controversy moot, the second portion of the project is but a gleam in the developer's eye. As the majority notes, it is only "vaguely defined, without a precise scope or timetable for completion." It is not funded, designed, or scheduled. In fact, there is no assurance it will ever be built, much less any final agency action. Thus, to the extent that Mr. West's complaint alleges any unique, specific challenges to Phase II, it is not ripe for adjudication.[1] See Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733-33, 140 L. Ed. 2d 921, 118 S. Ct. 1665 (1998); Laird v. Tatum, 408 U.S. 1, 14, 33 L. Ed. 2d 154, 92 S. Ct. 2318 (1972).
 
 
 41
 To the extent that the issues concerning the categorical exclusion grant are ripe and not moot, I would affirm the district court. "An agency's interpretation of the meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation." Alaska Center for the Environment v. U.S. Forest Service, 189 F.3d 851, 857 (9th Cir. 1999). The agency has concluded that the term "access control" embraces this project which does, in fact, primarily involve access control. This interpretation is not plainly erroneous, nor inconsistent with regulatory terms.
 
 
 42
 The record supports the district court's conclusion that the agency decision was neither arbitrary, nor capricious. Indeed, deployment of the interchange was designed to mitigate the environmental effects of large planned developments surrounding the sites. It also was aimed to make the best use of a reclaimed landfill upon which the interchange now sits. The FHWA's grant of the State's request for access approval was subject to FHWA's environmental review of the project. The State environmental review was extensive, including assessments of the project on air quality, water, vegetation, wildlife, natural resources, cultural resource, wildlife (including a biological assessment for bald eagles and marbled murrelets), environmental health, land use, housing, recreation and general aesthetics. No study suggested any significant environmental impact from the proposed project. After public hearings, the FHWA concluded that the documented categorical exclusion was appropriate. The district court gave thoughtful consideration to the agency's action, and concluded that it was neither arbitrary nor capricious. I agree.
 
 
 43
 For all these reasons, I respectfully dissent.
 
 
 
 [1]
 Mr. Wests complaint deos not reference Phase II, nor does the district court's opinion. Thus, I find it difficult to conclude that any adjudication was made as to issues unique to Phase II.